## SIBRON *v.* NEW YORK.

No. 63.  Argued December 11–12, 1967.—Decided June 10, 1968.*

---

*Together with No. 74, *Peters* v. *New York*, argued on December 12, 1967, also on appeal from the same court.

*Kalman Finkel* and *Gretchen White Oberman* argued the cause and filed briefs for appellant in No. 63. *Robert Stuart Friedman* argued the cause and filed a brief for appellant in No. 74.

*William I. Siegel* argued the cause for appellee in No. 63. With him on the brief was *Aaron E. Koota*. *James J. Duggan* argued the cause for appellee in No. 74. With him on the briefs was *Leonard Rubenfeld*.

*Michael Juviler* argued the cause for the District Attorney of New York County, as *amicus curiae,* in

No. 63. With him on the brief filed in both cases were *Frank S. Hogan* and *H. Richard Uviller*. *Mr. Siegel* argued the cause for the District Attorney of Kings County, as *amicus curiae,* in No. 74.

Briefs of *amici curiae,* urging reversal in both cases, were filed by *Jack Greenberg, James M. Nabrit III, Michael Meltsner, Melvyn Zarr,* and *Anthony G. Amsterdam* for the NAACP Legal Defense and Educational Fund, Inc., and by *Bernard A. Berkman, Melvin L. Wulf,* and *Alan H. Levine* for the American Civil Liberties Union et al.

*Louis J. Lefkowitz, pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Maria L. Marcus* and *Brenda Soloff,* Assistant Attorneys General, filed a brief for the Attorney General of New York, as *amicus curiae,* urging affirmance in both cases.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These are companion cases to No. 67, *Terry v. Ohio, ante,* p. 1, decided today. They present related questions under the Fourth and Fourteenth Amendments, but the cases arise in the context of New York's "stop-and-frisk" law, N. Y. Code Crim. Proc. § 180–a. This statute provides:

> "1. A police officer may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or any of the offenses specified in section five hundred fifty-two of this chapter, and may demand of him his name, address and an explanation of his actions.
>
> "2. When a police officer has stopped a person for questioning pursuant to this section and reasonably

"suspects that he is in danger of life or limb, he may search such person for a dangerous weapon. If the police officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

The appellants, Sibron and Peters, were both convicted of crimes in New York state courts on the basis of evidence seized from their persons by police officers. The Court of Appeals of New York held that the evidence was properly admitted, on the ground that the searches which uncovered it were authorized by the statute. *People* v. *Sibron*, 18 N. Y. 2d 603, 219 N. E. 2d 196, 272 N. Y. S. 2d 374 (1966) (memorandum); *People* v. *Peters*, 18 N. Y. 2d 238, 219 N. E. 2d 595, 273 N. Y. S. 2d 217 (1966). Sibron and Peters have appealed their convictions to this Court, claiming that § 180–a is unconstitutional on its face and as construed and applied, because the searches and seizures which it was held to have authorized violated their rights under the Fourth Amendment, made applicable to the States by the Fourteenth. *Mapp* v. *Ohio*, 367 U. S. 643 (1961). We noted probable jurisdiction, 386 U. S. 954 (1967); 386 U. S. 980 (1967), and consolidated the two cases for argument with No. 67.

The facts in these cases may be stated briefly. Sibron, the appellant in No. 63, was convicted of the unlawful possession of heroin.[1] He moved before trial to suppress

---

[1] N. Y. Pub. Health Law § 3305 makes the unauthorized possession of any narcotic drug unlawful, and §§ 1751 and 1751–a of the N. Y. Penal Law of 1909, then in effect, made the grade of the offense depend upon the amount of the drugs found in the possession of the defendant. The complaint in this case originally charged a felony, but the trial court granted the prosecutor's motion to reduce the

the heroin seized from his person by the arresting officer, Brooklyn Patrolman Anthony Martin. After the trial court denied his motion, Sibron pleaded guilty to the charge, preserving his right to appeal the evidentiary ruling.[2] At the hearing on the motion to suppress, Officer Martin testified that while he was patrolling his beat in uniform on March 9, 1965, he observed Sibron "continually from the hours of 4:00 P. M. to 12:00, midnight . . . in the vicinity of 742 Broadway." He stated that during this period of time he saw Sibron in conversation with six or eight persons whom he (Patrolman Martin) knew from past experience to be narcotics addicts. The officer testified that he did not overhear any of these conversations, and that he did not see anything pass between Sibron and any of the others. Late in the evening Sibron entered a restaurant. Patrolman Martin saw Sibron speak with three more known addicts inside the restaurant. Once again, nothing was overheard and nothing was seen to pass between Sibron and the addicts. Sibron sat down and ordered pie and coffee, and, as he was eating, Patrolman Martin approached him and told him to come outside. Once outside, the officer said to Sibron, "You know what I am after." According to the officer, Sibron "mumbled something and reached into his pocket." Simultaneously, Patrolman Martin thrust his hand into the same pocket, discovering several glassine envelopes, which, it turned out, contained heroin.

The State has had some difficulty in settling upon a

charge on the ground that "the Laboratory report will indicate a misdemeanor charge." Sibron was convicted of a misdemeanor and sentenced to six months in jail.

[2] N. Y. Code Crim. Proc. § 813–c provides that an order denying a motion to suppress evidence in a criminal case "may be reviewed on appeal from a judgment of conviction notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty."

46

theory for the admissibility of these envelopes of heroin. In his sworn complaint Patrolman Martin stated:

> "As the officer approached the defendant, the latter being in the direction of the officer and seeing him, he did put his hand in his left jacket pocket and pulled out a tinfoil envelope and did attempt to throw same to the ground. The officer never losing sight of the said envelope seized it from the def[endan]t's left hand, examined it and found it to contain ten glascine [*sic*] envelopes with a white substance alleged to be Heroin."

This version of the encounter, however, bears very little resemblance to Patrolman Martin's testimony at the hearing on the motion to suppress. In fact, he discarded the abandonment theory at the hearing.[3] Nor did the officer ever seriously suggest that he was in fear of bodily harm and that he searched Sibron in self-protection to find weapons.[4]

---

[3] Patrolman Martin stated several times that he put his hand into Sibron's pocket and seized the heroin before Sibron had any opportunity to remove his own hand from the pocket. The trial court questioned him on this point:

"Q. Would you say at that time that he reached into his pocket and handed the packets to you? Is that what he did or did he drop the packets?

"A. He did not drop them. *I do not know what his intentions were.* He pushed his hand into his pocket.

"Mr. JOSEPH [Prosecutor]: You intercepted it; didn't you, Officer?

"THE WITNESS: Yes." (Emphasis added.)

It is of course highly unlikely that Sibron, facing the officer at such close quarters, would have tried to remove the heroin from his pocket and throw it to the ground in the hope that he could escape responsibility for it.

[4] The possibility that Sibron, who never, so far as appears from the record, offered any resistance, might have posed a danger to

The prosecutor's theory at the hearing was that Patrolman Martin had probable cause to believe that Sibron was in possession of narcotics because he had seen him conversing with a number of known addicts over an eight-hour period. In the absence of any knowledge on Patrolman Martin's part concerning the nature of the intercourse between Sibron and the addicts, however, the trial court was inclined to grant the motion to suppress. As the judge stated, "All he knows about the unknown men: They are narcotics addicts. They might have been talking about the World Series. They might have been talking about prize fights." The prosecutor, however, reminded the judge that Sibron had admitted on the stand, in Patrolman Martin's absence, that he had been talking to the addicts about narcotics. Thereupon, the trial judge changed his mind and ruled that the officer had probable cause for an arrest.

Section 180–a, the "stop-and-frisk" statute, was not mentioned at any point in the trial court. The Appellate Term of the Supreme Court affirmed the conviction without opinion. In the Court of Appeals of New York, Sibron's case was consolidated with the *Peters* case, No. 74. The Court of Appeals held that the search in *Peters* was justified under the statute, but it wrote no opinion in Sibron's case. The dissents of Judges Fuld and Van Voorhis, however, indicate that the court rested its holding on § 180–a. At any rate, in its Brief in Oppo-

---

Patrolman Martin's safety was never even discussed as a potential justification for the search. The only mention of weapons by the officer in his entire testimony came in response to a leading question by Sibron's counsel, when Martin stated that he "thought he [Sibron] might have been" reaching for a gun. Even so, Patrolman Martin did not accept this suggestion by the opposition regarding the reason for his action; the discussion continued upon the plain premise that he had been looking for narcotics all the time.

sition to the Jurisdictional Statement in this Court, the State sought to justify the search on the basis of the statute. After we noted probable jurisdiction, the District Attorney for Kings County confessed error.

Peters, the appellant in No. 74, was convicted of possessing burglary tools under circumstances evincing an intent to employ them in the commission of a crime.[5] The tools were seized from his person at the time of his arrest, and like Sibron he made a pretrial motion to suppress them. When the trial court denied the motion, he too pleaded guilty, preserving his right to appeal. Officer Samuel Lasky of the New York City Police Department testified at the hearing on the motion that he was at home in his apartment in Mount Vernon, New York, at about 1 p. m. on July 10, 1964. He had just finished taking a shower and was drying himself when he heard a noise at his door. His attempt to investigate was interrupted by a telephone call, but when he returned and looked through the peephole into the hall, Officer Lasky saw "two men tiptoeing out of the alcove toward the stairway." He immediately called the police, put on some civilian clothes and armed himself with his service revolver. Returning to the peephole, he saw "a tall man tiptoeing away from the alcove and followed by this shorter man, Mr. Peters, toward the stairway." Officer Lasky testified that he had lived in the 120-unit building for 12 years and that he did not recognize either of the men as tenants. Believing that he had happened upon the two men in the course of an attempted burglary,[6]

---

[5] N. Y. Pen. Law of 1909, § 408, made the possession of such tools under such circumstances a misdemeanor for first offenders and a felony for all those who have "been previously convicted of any crime." Peters was convicted of a felony under this section.

[6] Officer Lasky testified that when he called the police immediately before leaving his apartment, he "told the Sergeant at the desk that two burglars were on my floor."

Officer Lasky opened his door, entered the hallway and slammed the door loudly behind him. This precipitated a flight down the stairs on the part of the two men,[7] and Officer Lasky gave chase. His apartment was located on the sixth floor, and he apprehended Peters between the fourth and fifth floors. Grabbing Peters by the collar, he continued down another flight in unsuccessful pursuit of the other man. Peters explained his presence in the building to Officer Lasky by saying that he was visiting a girl friend. However, he declined to reveal the girl friend's name, on the ground that she was a married woman. Officer Lasky patted Peters down for weapons, and discovered a hard object in his pocket. He stated at the hearing that the object did not feel like a gun, but that it might have been a knife. He removed the object from Peters' pocket. It was an opaque plastic envelope, containing burglar's tools.

The trial court explicitly refused to credit Peters' testimony that he was merely in the building to visit his girl friend. It found that Officer Lasky had the requisite "reasonable suspicion" of Peters under § 180-a to stop him and question him. It also found that Peters' response was "clearly unsatisfactory," and that "under

---

[7] Officer Lasky testified that when he emerged from his apartment, "I slammed the door, I had my gun and I ran down the stairs after them." A sworn affidavit of the Assistant District Attorney, which was before the trial court when it ruled on the motion to suppress, stated that when apprehended Peters was "fleeing down the steps of the building." The trial court explicitly took note of the flight of Peters and his companion as a factor contributing to Officer Lasky's "reasonable suspicion" of them:

"We think the testimony at the hearing does not require further laboring of this aspect of the matter, unless one is to believe that it is legitimately normal for a man to tip-toe about in the public hall of an apartment house while on a visit to his unidentified girl-friend, and, when observed by another tenant, to rapidly descend by stairway in the presence of elevators."

the circumstances Lasky's action in frisking Peters for a dangerous weapon was reasonable, even though Lasky was himself armed." It held that the hallway of the apartment building was a "public place" within the meaning of the statute. The Appellate Division of the Supreme Court affirmed without opinion. The Court of Appeals also affirmed, essentially adopting the reasoning of the trial judge, with Judges Fuld and Van Voorhis dissenting separately.

## I.

At the outset we must deal with the question whether we have jurisdiction in No. 63. It is asserted that because Sibron has completed service of the six-month sentence imposed upon him as a result of his conviction, the case has become moot under *St. Pierre* v. *United States,* 319 U. S. 41 (1943).[8] We have concluded that the case is not moot.

---

[8] The first suggestion of mootness in this case came upon oral argument, when it was revealed for the first time that appellant had been released. This fact did not appear in the record, despite the fact that the release occurred well over two years before the case was argued here. Nor was mootness hinted at by the State in its Brief in Opposition to the Jurisdictional Statement in this Court— where it took the position that the decision below was so clearly right that it did not merit further review—or in its brief on the merits—in which it conceded that the decision below clearly violated Sibron's constitutional rights and urged that it was an aberrant interpretation which should not impair the constitutionality of the New York statute. Following the suggestion of mootness on oral argument, moreover, the State filed a brief in which it amplified its views as to why the case should be held moot, but added the extraordinary suggestion that this Court should ignore the problem and pronounce upon the constitutionality of a statute in a case which has become moot. Normally in these circumstances we would consider ourselves fully justified in foreclosing a party upon an issue; however, since the question goes to the very existence of a controversy for us to adjudicate, we have undertaken to review it.

In the first place, it is clear that the broad dictum with which the Court commenced its discussion in *St. Pierre*—that "the case is moot because, after petitioner's service of his sentence and its expiration, there was no longer a subject matter on which the judgment of this Court could operate" (319 U. S., at 42)—fails to take account of significant qualifications recognized in *St. Pierre* and developed in later cases. Only a few days ago we held unanimously that the writ of habeas corpus was available to test the constitutionality of a state conviction where the petitioner had been in custody when he applied for the writ, but had been released before this Court could adjudicate his claims. *Carafas* v. *LaVallee,* 391 U. S. 234 (1968). On numerous occasions in the past this Court has proceeded to adjudicate the merits of criminal cases in which the sentence had been fully served or the probationary period during which a suspended sentence could be reimposed had terminated. *Ginsberg* v. *New York,* 390 U. S. 629 (1968); *Pollard* v. *United States,* 352 U. S. 354 (1957); *United States* v. *Morgan,* 346 U. S. 502 (1954); *Fiswick* v. *United States,* 329 U. S. 211 (1946). Thus mere release of the prisoner does not mechanically foreclose consideration of the merits by this Court.

*St. Pierre* itself recognized two possible exceptions to its "doctrine" of mootness, and both of them appear to us to be applicable here. The Court stated that "[i]t does not appear that petitioner could not have brought his case to this Court for review before the expiration of his sentence," noting also that because the petitioner's conviction was for contempt and because his controversy with the Government was a continuing one, there was a good chance that there would be "ample opportunity to review" the important question presented on the merits in a future proceeding. 319 U. S., at 43. This

was a plain recognition of the vital importance of keeping open avenues of judicial review of deprivations of constitutional right.[9]  There was no way for Sibron to bring his case here before his six-month sentence expired.  By statute he was precluded from obtaining bail pending appeal,[10] and by virtue of the inevitable delays of the New York court system, he was released less than a month after his newly appointed appellate counsel had been supplied with a copy of the transcript and roughly two months before it was physically possible to present his case to the first tier in the state appellate court system.[11]  This was true despite the fact that he took all steps to perfect his appeal in a prompt, diligent, and timely manner.

Many deep and abiding constitutional problems are encountered primarily at a level of "low visibility" in the criminal process—in the context of prosecutions for "minor" offenses which carry only short sentences.[12]  We do not believe that the Constitution contemplates that

---

[9] Cf. *Fay* v. *Noia*, 372 U. S. 391, 424 (1963):
"[C]onventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review."

[10] See N. Y. Code Crim. Proc. § 555 subd. 2.

[11] Sibron was arrested on March 9, 1965, and was unable to make bail before trial because of his indigency.  He thus remained in jail from that time until the expiration of his sentence (with good time credit) on July 10, 1965.  He was convicted on April 23.  His application for leave to proceed *in forma pauperis* was not granted until May 14, and his assigned appellate counsel was not provided with a transcript until June 11.  The Appellate Term of the Supreme Court recessed on June 7 until September.  Thus Sibron was released well before there had been any opportunity even to argue his case in the intermediate state appellate court.  A decision by the Court of Appeals of New York was not had until July 10, 1966, the anniversary of Sibron's release.

[12] Cf., *e. g.*, *Thompson* v. *City of Louisville*, 362 U. S. 199 (1960).

people deprived of constitutional rights at this level should be left utterly remediless and defenseless against repetitions of unconstitutional conduct. A State may not cut off federal review of whole classes of such cases by the simple expedient of a blanket denial of bail pending appeal. As *St. Pierre* clearly recognized, a State may not effectively deny a convict access to its appellate courts until he has been released and then argue that his case has been mooted by his failure to do what it alone prevented him from doing.[13]

The second exception recognized in *St. Pierre* permits adjudication of the merits of a criminal case where "under either state or federal law further penalties or disabilities can be imposed . . . as a result of the judgment which

---

[13] In *St. Pierre* the Court noted that the petitioner could have taken steps to preserve his case, but that "he did not apply to this Court for a stay or a supersedeas." 319 U. S., at 43. Here however, it is abundantly clear that there is no procedure of which Sibron could have availed himself to prevent the expiration of his sentence long before this Court could hear his case. A supersedeas from this Court is a purely ancillary writ, and may issue only in connection with an appeal actually taken. *Ex parte Ralston*, 119 U. S. 613 (1887); Sup. Ct. Rule 18; see R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States § 435, at 883 (R. Wolfson & P. Kurland ed., 1951). At the time Sibron completed service of his sentence, the only judgment outstanding was the conviction itself, rendered by the Criminal Court of the City of New York, County of Kings. This Court had no jurisdiction to hear an appeal from that judgment, since it was not rendered by the "highest court of a State in which a decision could be had," 28 U. S. C. § 1257, and there could be no warrant for interference with the orderly appellate processes of the state courts. Thus no supersedeas could have issued. Nor could this Court have ordered Sibron admitted to bail before the expiration of his sentence, since the offense was not bailable, 18 U. S. C. § 3144; see n. 10, *supra*. Thus this case is distinguishable from *St. Pierre* in that Sibron "could not have brought his case to this Court for review before the expiration of his sentence." 319 U. S., at 43.

has . . . been satisfied." 319 U. S., at 43. Subsequent cases have expanded this exception to the point where it may realistically be said that inroads have been made upon the principle itself. *St. Pierre* implied that the burden was upon the convict to show the existence of collateral legal consequences. Three years later in *Fiswick* v. *United States,* 329 U. S. 211 (1946), however, the Court held that a criminal case had not become moot upon release of the prisoner, noting that the convict, an alien, might be subject to deportation for having committed a crime of "moral turpitude"—even though it had never been held (and the Court refused to hold) that the crime of which he was convicted fell into this category. The Court also pointed to the fact that if the petitioner should in the future decide he wanted to become an American citizen, he might have difficulty proving that he was of "good moral character." *Id.,* at 222.[14]

The next case which dealt with the problem of collateral consequences was *United States* v. *Morgan,* 346 U. S. 502 (1954). There the convict had probably been subjected to a higher sentence as a recidivist by a state court on account of the old federal conviction which he sought to attack. But as the dissent pointed out, there was no indication that the recidivist increment would be removed from his state sentence upon invalidation of the federal conviction, *id.,* at 516, n. 4, and the Court chose to rest its holding that the case was not moot upon

---

[14] Compare *Ginsberg* v. *New York,* 390 U. S. 629, 633, n. 2 (1968), where this Court held that the mere possibility that the Commissioner of Buildings of the Town of Hempstead, New York, might "in his discretion" attempt in the future to revoke a license to run a luncheonette because of a single conviction for selling relatively inoffensive "girlie" magazines to a 16-year-old boy was sufficient to preserve a criminal case from mootness.

a broader view of the matter. Without canvassing the possible disabilities which might be imposed upon Morgan or alluding specifically to the recidivist sentence, the Court stated:

> "Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected. As the power to remedy an invalid sentence exists, we think, respondent is entitled to an opportunity to attempt to show that this conviction was invalid." *Id.*, at 512–513.

Three years later, in *Pollard* v. *United States,* 352 U. S. 354 (1957), the Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed. With nothing more than citations to *Morgan* and *Fiswick,* and a statement that "convictions may entail collateral legal disadvantages in the future," *id.,* at 358, the Court concluded that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits." *Ibid.* The Court thus acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.[15] The mere "possibility" that this will be the case is enough to preserve a criminal case from ending "ignominiously in the limbo of mootness." *Parker* v. *Ellis,* 362 U. S. 574, 577 (1960) (dissenting opinion).

This case certainly meets that test for survival. Without pausing to canvass the possibilities in detail, we note that New York expressly provides by statute that Sibron's conviction may be used to impeach his character should he choose to put it in issue at any future

---

[15] See generally Note, 53 Va. L. Rev. 403 (1967).

criminal trial, N. Y. Code Crim. Proc. § 393–c, and that it must be submitted to a trial judge for his consideration in sentencing should Sibron again be convicted of a crime, N. Y. Code Crim. Proc. § 482. There are doubtless other collateral consequences. Moreover, we see no relevance in the fact that Sibron is a multiple offender. Morgan was a multiple offender, see 346 U. S. at 503–504, and so was Pollard, see 352 U. S., at 355–357. A judge or jury faced with a question of character, like a sentencing judge, may be inclined to forgive or at least discount a limited number of minor transgressions, particularly if they occurred at some time in the relatively distant past.[16] It is impossible for this Court to say at what point the number of convictions on a man's record renders his reputation irredeemable.[17] And even if we believed that an individual had reached that point, it would be impossible for us to say that he had no interest in beginning the process of redemption with the particular case sought to be adjudicated. We cannot foretell what opportunities might present themselves in the future for the removal of other convictions from an individual's record. The question of the validity of a criminal conviction can arise in many contexts, compare *Burgett* v. *Texas*, 389 U. S. 109 (1967), and the sooner the issue is fully litigated the better for all concerned. It is always preferable to litigate a matter

---

[16] We do not know from the record how many convictions Sibron had, for what crimes, or when they were rendered. At the hearing he admitted to a 1955 conviction for burglary and a 1957 misdemeanor conviction for possession of narcotics. He also admitted that he had other convictions, but none were specifically alluded to.

[17] We note that there is a clear distinction between a general impairment of credibility, to which the Court referred in *St. Pierre*, see 319 U. S., at 43, and New York's specific statutory authorization for use of the conviction to impeach the "character" of a defendant in a criminal proceeding. The latter is a clear legal disability deliberately and specifically imposed by the legislature.

when it is directly and principally in dispute, rather than in a proceeding where it is collateral to the central controversy. Moreover, litigation is better conducted when the dispute is fresh and additional facts may, if necessary, be taken without a substantial risk that witnesses will die or memories fade. And it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose it on the basis of some past action. Cf. *Peyton* v. *Rowe,* 391 U. S. 54, 64 (1968).[18]

None of the concededly imperative policies behind the constitutional rule against entertaining moot controversies would be served by a dismissal in this case. There is nothing abstract, feigned, or hypothetical about Sibron's appeal. Nor is there any suggestion that either Sibron or the State has been wanting in diligence or fervor in the litigation. We have before us a fully developed record of testimony about contested historical facts, which reflects the "impact of actuality"[19] to a far greater degree than many controversies accepted for adjudication as a matter of course under the Federal Declaratory Judgment Act, 28 U. S. C. § 2201.

*St. Pierre* v. *United States, supra,* must be read in light of later cases to mean that a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction. That certainly is not

---

[18] This factor has clearly been considered relevant by the Court in the past in determining the issue of mootness. See *Fiswick* v. *United States,* 329 U. S. 211, 221–222 (1946).

[19] Frankfurter, A Note on Advisory Opinions, 37 Harv. L. Rev. 1002, 1006 (1924). See also *Parker* v. *Ellis,* 362 U. S. 574, 592–593 (1960) (dissenting opinion).

the case here. Sibron "has a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick* v. *United States, supra,* at 222. The case is not moot.

## II.

We deal next with the confession of error by the District Attorney for Kings County in No. 63. Confessions of error are, of course, entitled to and given great weight, but they do not "relieve this Court of the performance of the judicial function." *Young* v. *United States,* 315 U. S. 257, 258 (1942). It is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained. For one thing, as we noted in *Young,* "our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." 315 U. S., at 259. See also *Marino* v. *Ragen,* 332 U. S. 561 (1947). This consideration is entitled to special weight where, as in this case, we deal with a judgment of a State's highest court interpreting a state statute which is challenged on constitutional grounds. The need for such authoritative declarations of state law in sensitive constitutional contexts has been the very reason for the development of the abstention doctrine by this Court. See, *e. g., Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941). Such a judgment is the final product of a sovereign judicial system, and is deserving of respectful treatment by this Court. Moreover, in this case the confession of error on behalf of the entire state executive and judicial branches is made, not by a state official, but by the elected legal officer of one political subdivision within the State. The District Attorney for Kings County seems to have come late to the opinion that this conviction violated Sibron's constitutional

rights. For us to accept his view blindly in the circumstances, when a majority of the Court of Appeals of New York has expressed the contrary view, would be a disservice to the State of New York and an abdication of our obligation to lower courts to decide cases upon proper constitutional grounds in a manner which permits them to conform their future behavior to the demands of the Constitution. We turn to the merits.

### III.

The parties on both sides of these two cases have urged that the principal issue before us is the constitutionality of § 180–a "on its face." We decline, however, to be drawn into what we view as the abstract and unproductive exercise of laying the extraordinarily elastic categories of § 180–a next to the categories of the Fourth Amendment in an effort to determine whether the two are in some sense compatible. The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case. In this respect it is quite different from the question of the adequacy of the procedural safeguards written into a statute which purports to authorize the issuance of search warrants in certain circumstances. See *Berger* v. *New York*, 388 U. S. 41 (1967). No search required to be made under a warrant is valid if the procedure for the issuance of the warrant is inadequate to ensure the sort of neutral contemplation by a magistrate of the grounds for the search and its proposed scope, which lies at the heart of the Fourth Amendment. *E. g.*, *Aguilar* v. *Texas*, 378 U. S. 108 (1964); *Giordenello* v. *United States*, 357 U. S. 480 (1958). This Court held last Term in *Berger* v. *New York*, *supra*, that N. Y. Code Crim Proc. § 813–a, which established a procedure for the issuance of search warrants to permit electronic eavesdropping, failed to

embody the safeguards demanded by the Fourth and Fourteenth Amendments.

Section 180–a, unlike § 813–a, deals with the substantive validity of certain types of seizures and searches without warrants. It purports to authorize police officers to "stop" people, "demand" explanations of them and "search [them] for dangerous weapon[s]" in certain circumstances upon "reasonable suspicion" that they are engaged in criminal activity and that they represent a danger to the policeman. The operative categories of § 180–a are not the categories of the Fourth Amendment, and they are susceptible of a wide variety of interpretations.[20] New York is, of course, free to develop its own

---

[20] It is not apparent, for example, whether the power to "stop" granted by the statute entails a power to "detain" for investigation or interrogation upon less than probable cause, or if so what sort of durational limitations upon such detention are contemplated. And while the statute's apparent grant of a power of compulsion indicates that many "stops" will constitute "seizures," it is not clear that all conduct analyzed under the rubric of the statute will either rise to the level of a "seizure" or be based upon less than probable cause. In No. 74, the *Peters* case, for example, the New York courts justified the seizure of appellant under § 180–a, but we have concluded that there was in fact probable cause for an arrest when Officer Lasky seized Peters on the stairway. See *infra*, at 66. In any event, a pronouncement by this Court upon the abstract validity of § 180–a's "stop" category would be most inappropriate in these cases, since we have concluded that neither of them presents the question of the validity of a seizure of the person for purposes of interrogation upon less than probable cause.

The statute's other categories are equally elastic, and it was passed too recently for the State's highest court to have ruled upon many of the questions involving potential intersections with federal constitutional guarantees. We cannot tell, for example, whether the officer's power to "demand" of a person an "explanation of his actions" contemplates either an obligation on the part of the citizen to answer or some additional power on the part of the officer in the event of a refusal to answer, or even whether the interrogation following the "stop" is "custodial." Compare *Miranda* v. *Arizona*, 384 U. S.

law of search and seizure to meet the needs of local law enforcement, see *Ker* v. *California,* 374 U. S. 23, 34 (1963), and in the process it may call the standards it employs by any names it may choose. It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct. The question in this Court upon review of a state-approved search or seizure "is not whether the search [or seizure] was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one." *Cooper* v. *California,* 386 U. S. 58, 61 (1967).

Accordingly, we make no pronouncement on the facial constitutionality of § 180–a. The constitutional point

---

436 (1966). There are, moreover, substantial indications that the statutory category of a "search for a dangerous weapon" may encompass conduct considerably broader in scope than that which we approved in *Terry* v. *Ohio, ante,* p. 1. See *infra,* at 65–66. See also *People* v. *Taggart,* 20 N. Y. 2d 335, 229 N. E. 2d 581, 283 N. Y. S. 2d 1 (1967). At least some of the activity apparently permitted under the rubric of searching for dangerous weapons may thus be permissible under the Constitution only if the "reasonable suspicion" of criminal activity rises to the level of probable cause. Finally, it is impossible to tell whether the standard of "reasonable suspicion" connotes the same sort of specificity, reliability, and objectivity which is the touchstone of permissible governmental action under the Fourth Amendment. Compare *Terry* v. *Ohio, supra,* with *People* v. *Taggart, supra.* In this connection we note that the searches and seizures in both *Sibron* and *Peters* were upheld by the Court of Appeals of New York as predicated upon "reasonable suspicion," whereas we have concluded that the officer in *Peters* had probable cause for an arrest, while the policeman in *Sibron* was not possessed of any information which would justify an intrusion upon rights protected by the Fourth Amendment.

with respect to a statute of this peculiar sort, as the Court of Appeals of New York recognized, is "not so much . . . the language employed as . . . the *conduct it authorizes.*" *People* v. *Peters,* 18 N. Y. 2d 238, 245, 219 N. E. 2d 595, 599, 273 N. Y. S. 2d 217, 222 (1966). We have held today in *Terry* v. *Ohio, ante,* p. 1, that police conduct of the sort with which § 180–a deals must be judged under the Reasonable Search and Seizure Clause of the Fourth Amendment. The inquiry under that clause may differ sharply from the inquiry set up by the categories of § 180–a. Our constitutional inquiry would not be furthered here by an attempt to pronounce judgment on the words of the statute. We must confine our review instead to the reasonableness of the searches and seizures which underlie these two convictions.

## IV.

Turning to the facts of Sibron's case, it is clear that the heroin was inadmissible in evidence against him. The prosecution has quite properly abandoned the notion that there was probable cause to arrest Sibron for any crime at the time Patrolman Martin accosted him in the restaurant, took him outside and searched him. The officer was not acquainted with Sibron and had no information concerning him. He merely saw Sibron talking to a number of known narcotics addicts over a period of eight hours. It must be emphasized that Patrolman Martin was completely ignorant regarding the content of these conversations, and that he saw nothing pass between Sibron and the addicts. So far as he knew, they might indeed "have been talking about the World Series." The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security. Nothing resembling probable cause existed

until after the search had turned up the envelopes of heroin. It is axiomatic that an incident search may not precede an arrest and serve as part of its justification. *E. g., Henry* v. *United States,* 361 U. S. 98 (1959); *Johnson* v. *United States,* 333 U. S. 10, 16–17 (1948). Thus the search cannot be justified as incident to a lawful arrest.

If Patrolman Martin lacked probable cause for an arrest, however, his seizure and search of Sibron might still have been justified at the outset if he had reasonable grounds to believe that Sibron was armed and dangerous. *Terry* v. *Ohio, ante,* p. 1. We are not called upon to decide in this case whether there was a "seizure" of Sibron inside the restaurant antecedent to the physical seizure which accompanied the search. The record is unclear with respect to what transpired between Sibron and the officer inside the restaurant. It is totally barren of any indication whether Sibron accompanied Patrolman Martin outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation. In any event, this deficiency in the record is immaterial, since Patrolman Martin obtained no new information in the interval between his initiation of the encounter in the restaurant and his physical seizure and search of Sibron outside.

Although the Court of Appeals of New York wrote no opinion in this case, it seems to have viewed the search here as a self-protective search for weapons and to have affirmed on the basis of § 180–a, which authorizes such a search when the officer "reasonably suspects that he is in danger of life or limb." The Court of Appeals has, at any rate, justified searches during field interrogation on the ground that "[t]he answer to the question propounded by the policeman may be a

bullet; in any case the exposure to danger could be very great." *People* v. *Rivera,* 14 N. Y. 2d 441, 446, 201 N. E. 2d 32, 35, 252 N. Y. S. 2d 458, 463 (1964), cert. denied, 379 U. S. 978 (1965). But the application of this reasoning to the facts of this case proves too much. The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. *Terry* v. *Ohio, supra.* Patrolman Martin's testimony reveals no such facts. The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime. Nor did Patrolman Martin urge that when Sibron put his hand in his pocket, he feared that he was going for a weapon and acted in self-defense. His opening statement to Sibron—"You know what I am after"—made it abundantly clear that he sought narcotics, and his testimony at the hearing left no doubt that he thought there were narcotics in Sibron's pocket.[21]

---

[21] It is argued in dissent that this Court has in effect overturned factual findings by the two courts below that the search in this case was a self-protective measure on the part of Patrolman Martin, who thought that Sibron might have been reaching for a gun. It is true, as we have noted, that the Court of Appeals of New York apparently rested its approval of the search on this view. The trial court, however, made no such finding of fact. The trial judge adopted the theory of the prosecution at the hearing on the motion to suppress. This theory was that there was probable cause to arrest Sibron for some crime having to do with narcotics. The fact

Even assuming *arguendo* that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man. Such a search violates the guarantee of the Fourth

which tipped the scales for the trial court had nothing to do with danger to the policeman. The judge expressly changed his original view and held the heroin admissible upon being reminded that Sibron had admitted on the stand that he spoke to the addicts about narcotics. This admission was not relevant on the issue of probable cause, and we do not understand the dissent to take the position that prior to the discovery of heroin, there was probable cause for an arrest.

Moreover, Patrolman Martin himself never at any time put forth the notion that he acted to protect himself. As we have noted, this subject never came up, until on re-direct examination defense counsel raised the question whether Patrolman Martin thought Sibron was going for a gun. See n. 4, *supra*. This was the only reference to weapons at any point in the hearing, and the subject was swiftly dropped. In the circumstances an unarticulated "finding" by an appellate court which wrote no opinion, apparently to the effect that the officer's invasion of Sibron's person comported with the Constitution because of the need to protect himself, is not deserving of controlling deference.

Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents.

## V.

We think it is equally clear that the search in Peters' case was wholly reasonable under the Constitution. The Court of Appeals of New York held that the search was made legal by § 180–a, since Peters was "abroad in a public place," and since Officer Lasky was reasonably suspicious of his activities and, once he had stopped Peters, reasonably suspected that he was in danger of life or limb, even though he held Peters at gun point. This may be the justification for the search under state law. We think, however, that for purposes of the Fourth Amendment the search was properly incident to a lawful arrest. By the time Officer Lasky caught up with Peters on the stairway between the fourth and fifth floors of the apartment building, he had probable cause to arrest him for attempted burglary. The officer heard strange noises at his door which apparently led him to believe that someone sought to force entry. When he investigated these noises he saw two men, whom he had never seen before in his 12 years in the building, tiptoeing furtively about the hallway. They were still engaged in these maneuvers after he called the police and dressed hurriedly. And when Officer Lasky entered the hallway, the men fled down the stairs. It is difficult to conceive of stronger grounds for an arrest, short of actual eye-witness observation of criminal activity. As the trial court explicitly recognized,[22] deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea,* and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors

---

[22] See n. 7, *supra.*

to be considered in the decision to make an arrest. *Brinegar* v. *United States,* 338 U. S. 160 (1949); *Husty* v. *United States,* 282 U. S. 694 (1931); see *Henry* v. *United States,* 361 U. S. 98, 103 (1959).

As we noted in Sibron's case, a search incident to a lawful arrest may not precede the arrest and serve as part of its justification. It is a question of fact precisely when, in each case, the arrest took place. *Rios* v. *United States,* 364 U. S. 253, 261–262 (1960). And while there was some inconclusive discussion in the trial court concerning when Officer Lasky "arrested" Peters, it is clear that the arrest had, for purposes of constitutional justification, already taken place before the search commenced. When the policeman grabbed Peters by the collar, he abruptly "seized" him and curtailed his freedom of movement on the basis of probable cause to believe that he was engaged in criminal activity. See *Henry* v. *United States, supra,* at 103. At that point he had the authority to search Peters, and the incident search was obviously justified "by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime." *Preston* v. *United States,* 376 U. S. 364, 367 (1964). Moreover, it was reasonably limited in scope by these purposes. Officer Lasky did not engage in an unrestrained and thorough-going examination of Peters and his personal effects. He seized him to cut short his flight, and he searched him primarily for weapons. While patting down his outer clothing, Officer Lasky discovered an object in his pocket which might have been used as a weapon. He seized it and discovered it to be a potential instrument of the crime of burglary.

We have concluded that Peters' conviction fully comports with the commands of the Fourth and Fourteenth Amendments, and must be affirmed. The conviction in

No. 63, however, must be reversed, on the ground that the heroin was unconstitutionally admitted in evidence against the appellant.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring in No. 63.

Officer Martin testified that on the night in question he observed appellant Sibron continually from 4 p. m. to 12 midnight and that during that eight-hour period, Sibron conversed with different persons each personally known to Martin as narcotics addicts. When Sibron entered a restaurant, Martin followed him inside where he observed Sibron talking to three other persons also personally known to Martin as narcotics addicts. At that point he approached Sibron and asked him to come outside. When Sibron stepped out, Martin said, "You know what I am after." Sibron then reached inside his pocket, and at the same time Martin reached into the same pocket and discovered several glassine envelopes which were found to contain heroin. Sibron was subsequently convicted of unlawful possession of heroin.

Consorting with criminals may in a particular factual setting be a basis for believing that a criminal project is underway. Yet talking with addicts without more rises no higher than suspicion. That is all we have here; and if it is sufficient for a "seizure" and a "search," then there is no such thing as privacy for this vast group of "sick" people.

MR. JUSTICE DOUGLAS, concurring in No. 74.

Officer Lasky testified that he resided in a multiple-dwelling apartment house in Mount Vernon, New York. His apartment was on the sixth floor. At about 1 in the afternoon, he had just stepped out of the shower and was drying himself when he heard a noise at his door. Just then his phone rang and he answered the call.

After hanging up, he looked through the peephole of his door and saw two men, one of whom was appellant, tiptoeing out of an alcove toward the stairway. He phoned his headquarters to report this occurrence, and then put on some clothes and proceeded back to the door. This time he saw a tall man tiptoeing away from the alcove, followed by appellant, toward the stairway. Lasky came out of his apartment, slammed the door behind him, and then gave chase, gun in hand, as the two men began to run down the stairs. He apprehended appellant on the stairway between the fourth and fifth floors, and asked what he was doing in the building. Appellant replied that he was looking for a girl friend, but refused to give her name, saying that she was a married woman. Lasky then "frisked" appellant for a weapon, and discovered in his right pants pocket a plastic envelope. The envelope contained a tension bar, 6 picks and 2 Allen wrenches with the short leg filed down to a screwdriver edge. Appellant was subsequently convicted for possession of burglary tools.

I would hold that at the time Lasky seized appellant, he had probable cause to believe that appellant was on some kind of burglary or housebreaking mission.* In my view he had probable cause to seize appellant and accordingly to conduct a limited search of his person for weapons.

MR. JUSTICE WHITE, concurring.

I join Parts I–IV of the Court's opinion. With respect to appellant Peters, I join the affirmance of his conviction, not because there was probable cause to arrest, a question I do not reach, but because there was probable cause to stop Peters for questioning and thus to frisk him for dangerous weapons. See my concurring

---

*See N. Y. Pen. Code §§ 140.20, 140.25 (1967).

opinion in *Terry* v. *Ohio, ante,* p. 34. While patting down Peters' clothing the officer "discovered an object in his pocket which might have been used as a weapon." *Ante,* at 67. That object turned out to be a package of burglar's tools. In my view those tools were properly admitted into evidence.

MR. JUSTICE FORTAS, concurring.

1. I would construe *St. Pierre* v. *United States,* 319 U. S. 41 (1943), in light of later cases, to mean that a criminal case is moot *if it appears* that no collateral legal consequences will be imposed on the basis of the challenged conviction. (Cf. majority opinion, *ante,* at 57–58.)

2. I join without qualification in the Court's judgment and opinion concerning the standards to be used in determining whether § 180–a as applied to particular situations is constitutional. But I would explicitly reserve the possibility that a statute purporting to authorize a warrantless search might be so extreme as to justify our concluding that it is unconstitutional "on its face," regardless of the facts of the particular case. To the extent that the Court's opinion may indicate the contrary, I disagree. (Cf. majority opinion, *ante,* at 59–62.)

3. In Sibron's case (No. 63), I would conclude that we find nothing in the record of this case or pertinent principles of law to cause us to disregard the confession of error by counsel for Kings County. I would not discourage confessions of error nor would I disregard them. (Cf. majority opinion, pt. II, *ante,* at 58–59.)

MR. JUSTICE HARLAN, concurring in the result.

I fully agree with the results the Court has reached in these cases. They are, I think, consonant with and dictated by the decision in *Terry* v. *Ohio, ante,* p. 1. For reasons I do not understand, however, the Court has declined to rest the judgments here upon the principles

of *Terry*. In doing so it has, in at least one particular, made serious inroads upon the protection afforded by the Fourth and Fourteenth Amendments.

The Court is of course entirely correct in concluding that we should not pass upon the constitutionality of the New York stop-and-frisk law "on its face." The statute is certainly not unconstitutional on its face: that is, it does not plainly purport to authorize unconstitutional activities by policemen. Nor is it "constitutional on its face" if that expression means that any action now or later thought to fall within the terms of the statute is, *ipso facto,* within constitutional limits as well. No statute, state or federal, receives any such *imprimatur* from this Court.

This does not mean, however, that the statute should be ignored here. The State of New York has made a deliberate effort to deal with the complex problem of on-the-street policework. Without giving *carte blanche* to any particular verbal formulation, we should, I think, where relevant, indicate the extent to which that effort has been constitutionally successful. The core of the New York statute is the permission to stop any person reasonably suspected of crime. Under the decision in *Terry* a right to stop may indeed be premised on reasonable suspicion and does not require probable cause, and hence the New York formulation is to that extent constitutional. This does not mean that suspicion need not be "reasonable" in the constitutional as well as the statutory sense. Nor does it mean that this Court has approved more than a momentary stop or has indicated what questioning may constitutionally occur during a stop, for the cases before us do not raise these questions.[1]

---

[1] For a thoughtful study of many of these points, see ALI Model Code of Pre-Arraignment Procedure, Tentative Draft No. 1, §§ 2.01, 2.02, and the commentary on these sections appearing at 87–105.

Turning to the individual cases, I agree that the conviction in No. 63, *Sibron,* should be reversed, and would do so upon the premises of *Terry.* At the outset, I agree that sufficient collateral legal consequences of Sibron's conviction have been shown to prevent this case from being moot, and I agree that the case should not be reversed simply on the State's confession of error.

The considerable confusion that has surrounded the "search" or "frisk" of Sibron that led to the actual recovery of the heroin seems to me irrelevant for our purposes. Officer Martin repudiated his first statement, which might conceivably have indicated a theory of "abandonment," see *ante,* at 45–46. No matter which of the other theories is adopted, it is clear that there was at least a forcible frisk, comparable to that which occurred in *Terry,* which requires constitutional justification.

Since carrying heroin is a crime in New York, probable cause to believe Sibron was carrying heroin would also have been probable cause to arrest him. As the Court says, Officer Martin clearly had neither. Although Sibron had had conversations with several known addicts, he had done nothing, during the several hours he was under surveillance, that made it "probable" that he was either carrying heroin himself or engaging in transactions with these acquaintances.

Nor were there here reasonable grounds for a *Terry*-type "stop" short of an arrest. I would accept, as an adequate general formula, the New York requirement that the officer must "reasonably suspect" that the person he stops "is committing, has committed or is about to commit a felony." N. Y. Code Crim. Proc. § 180–a. "On its face," this requirement is, if anything, more stringent than the requirement stated by the Court in *Terry:* "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ."

*Ante,* at 30. The interpretation of the New York statute is of course a matter for the New York courts, but any particular stop must meet the *Terry* standard as well.

The forcible encounter between Officer Martin and Sibron did not meet the *Terry* reasonableness standard. In the first place, although association with known criminals may, I think, properly be a factor contributing to the suspiciousness of circumstances, it does not, entirely by itself, create suspicion adequate to support a stop. There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current, or intended. That was the case in *Terry,* but it palpably was not the case here. For eight continuous hours, up to the point when he interrupted Sibron eating a piece of pie, Officer Martin apparently observed not a single suspicious action and heard not a single suspicious word on the part of Sibron himself or any person with whom he associated. If anything, that period of surveillance pointed away from suspicion.

Furthermore, in *Terry,* the police officer judged that his suspect was about to commit a violent crime and that he had to assert himself in order to prevent it. Here there was no reason for Officer Martin to think that an incipient crime, or flight, or the destruction of evidence would occur if he stayed his hand; indeed, there was no more reason for him to intrude upon Sibron at the moment when he did than there had been four hours earlier, and no reason to think the situation would have changed four hours later. While no hard-and-fast rule can be drawn, I would suggest that one important factor, missing here, that should be taken into account in determining whether there are reasonable grounds for a forcible intrusion is whether there is any need for immediate action.

For these reasons I would hold that Officer Martin lacked reasonable grounds to intrude forcibly upon Sibron. In consequence, the essential premise for the right to conduct a self-protective frisk was lacking. See my concurring opinion in *Terry, ante,* p. 31. I therefore find it unnecessary to reach two further troublesome questions. First, although I think that, as in *Terry,* the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed, it is not clear that suspected possession of narcotics falls into this category. If the nature of the suspected offense creates no reasonable apprehension for the officer's safety, I would not permit him to frisk unless other circumstances did so. Second, I agree with the Court that even where a self-protective frisk is proper, its scope should be limited to what is adequate for its purposes. I see no need here to resolve the question whether this frisk exceeded those bounds.

Turning now to No. 74, *Peters,* I agree that the conviction should be upheld, but here I would differ strongly and fundamentally with the Court's approach. The Court holds that the burglar's tools were recovered from Peters in a search incident to a lawful arrest. I do not think that Officer Lasky had anything close to probable cause to arrest Peters before he recovered the burglar's tools. Indeed, if probable cause existed here, I find it difficult to see why a different rationale was necessary to support the stop and frisk in *Terry* and why States such as New York have had to devote so much thought to the constitutional problems of field interrogation. This case will be the latest in an exceedingly small number of cases in this Court indicating what suffices for probable cause. While, as the Court noted in *Terry,* the influence of this Court on police tactics "in

the field" is necessarily limited, the influence of a decision here on hundreds of courts and magistrates who have to decide whether there is probable cause for a real arrest or a full search will be large.

Officer Lasky testified that at 1 o'clock in the afternoon he heard a noise at the door to his apartment. He did not testify, nor did any state court conclude, that this "led him to believe that someone sought to force entry." *Ante,* at 66. He looked out into the public hallway and saw two men whom he did not recognize, surely not a strange occurrence in a large apartment building. One of them appeared to be tip-toeing. Lasky did not testify that the other man was tip-toeing or that either of them was behaving "furtively." *Ibid.* Lasky left his apartment and ran to them, gun in hand. He did not testify that there was any "flight," *ante,* at 66,[2] though flight at the approach of a gun-carrying stranger (Lasky was apparently not in uniform) is hardly indicative of *mens rea.*

Probable cause to arrest means evidence that would warrant a prudent and reasonable man (such as a magistrate, actual or hypothetical) in believing that a particular person has committed or is committing a crime.[3]

---

[2] It is true, as the Court states, that the New York courts attributed such a statement to him. The attribution seems to me unwarranted by the record.

[3] *E. g., Beck* v. *Ohio,* 379 U. S. 89; *Rios* v. *United States,* 364 U. S. 253; *Henry* v. *United States,* 361 U. S. 98. In *Henry, supra,* at 100, the Court said that 18 U. S. C. § 3052 "states the constitutional standard" for felony arrests by FBI agents without warrant. That section authorized agents to "make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." Under *Ker* v. *California,* 374 U. S. 23, a parallel standard is applicable to warrantless arrests by state and local police.

Officer Lasky had no extrinsic reason to think that a crime had been or was being committed, so whether it would have been proper to issue a warrant depends entirely on his statements of his observations of the men. Apart from his conclusory statement that he thought the men were burglars, he offered very little specific evidence. I find it hard to believe that if Peters had made good his escape and there were no report of a burglary in the neighborhood, this Court would hold it proper for a prudent neutral magistrate to issue a warrant for his arrest.[4]

In the course of upholding Peters' conviction, the Court makes two other points that may lead to future confusion. The first concerns the "moment of arrest." If there is an escalating encounter between a policeman and a citizen, beginning perhaps with a friendly conversation but ending in imprisonment, and if evidence is developing during that encounter, it may be important to identify the moment of arrest, *i. e.*, the moment when the policeman was not permitted to proceed further unless he by then had probable cause. This moment-of-arrest problem is not, on the Court's premises, in any way involved in this case: the Court holds that Officer Lasky had probable cause to arrest at the moment he caught Peters, and hence probable cause clearly preceded anything that might be thought an arrest. The Court implies, however, that although there is no problem about whether the arrest of Peters occurred

---

[4] Compare *Henry* v. *United States,* 361 U. S. 98, in which the Court said there was "far from enough evidence . . . to justify a magistrate in issuing a warrant." *Id.,* at 103. Agents knew that a federal crime, theft of whisky from an interstate shipment, had been committed "in the neighborhood." Petitioner was observed driving into an alley, picking up packages, and driving away. I agree that these facts did not constitute probable cause, but find it hard to see that the evidence here was more impressive.

*late* enough, *i. e.,* after probable cause developed, there might be a problem about whether it occurred *early* enough, *i. e.,* before Peters was searched. This seems to me a false problem. Of course, the fruits of a search may not be used to justify an arrest to which it is incident, but this means only that probable cause to arrest must precede the search. If the prosecution shows probable cause to arrest prior to a search of a man's person, it has met its total burden. There is *no* case in which a defendant may validly say, "Although the officer had a right to arrest me at the moment when he seized me and searched my person, the search is invalid because he did not in fact arrest me until afterwards."

This fact is important because, as demonstrated by *Terry,* not every curtailment of freedom of movement is an "arrest" requiring antecedent probable cause. At the same time, an officer who does have probable cause may of course seize and search immediately. Hence while certain police actions will undoubtedly turn an encounter into an arrest requiring antecedent probable cause, the prosecution must be able to date the arrest as *early* as it chooses following the development of probable cause.

The second possible source of confusion is the Court's statement that "Officer Lasky did not engage in an unrestrained and thorough-going examination of Peters and his personal effects." *Ante,* at 67. Since the Court found probable cause to arrest Peters, and since an officer arresting on probable cause is entitled to make a very full incident search,[5] I assume that this is merely a factual observation. As a factual matter, I agree with it.

Although the articulable circumstances are somewhat less suspicious here than they were in *Terry,* I would affirm on the *Terry* ground that Officer Lasky had reason-

---

[5] The leading case is *United States* v. *Rabinowitz,* 339 U. S. 56.

able cause to make a forced stop. Unlike probable cause to arrest, reasonable grounds to stop do not depend on any degree of likelihood that a crime *has* been committed. An officer may forcibly intrude upon an incipient crime even where he could not make an arrest for the simple reason that there is nothing to arrest anyone for. Hence although Officer Lasky had small reason to believe that a crime had been committed, his right to stop Peters can be justified if he had a reasonable suspicion that Peters was about to attempt burglary.

It was clear that the officer had to act quickly if he was going to act at all, and, as stated above, it seems to me that where immediate action is obviously required, a police officer is justified in acting on rather less objectively articulable evidence than when there is more time for consideration of alternative courses of action. Perhaps more important, the Court's opinion in *Terry* emphasized the special qualifications of an experienced police officer. While "probable cause" to arrest or search has always depended on the existence of hard evidence that would persuade a "reasonable man," in judging on-the-street encounters it seems to me proper to take into account a police officer's trained instinctive judgment operating on a multitude of small gestures and actions impossible to reconstruct. Thus the statement by an officer that "he looked like a burglar to me" adds little to an affidavit filed with a magistrate in an effort to obtain a warrant. When the question is whether it was reasonable to take limited but forcible steps in a situation requiring immediate action, however, such a statement looms larger. A court is of course entitled to disbelieve the officer (who is subject to cross-examination), but when it believes him and when there are some articulable supporting facts, it is entitled to find action taken under fire to be reasonable.

Given Officer Lasky's statement of the circumstances, and crediting his experienced judgment as he watched the two men, the state courts were entitled to conclude, as they did, that Lasky forcibly stopped Peters on "reasonable suspicion." The frisk made incident to that stop was a limited one, which turned up burglar's tools. Although the frisk is constitutionally permitted only in order to protect the officer, if it is lawful the State is of course entitled to the use of any other contraband that appears.

For the foregoing reasons I concur in the result in these cases.

MR. JUSTICE BLACK, concurring in No. 74 and dissenting in No. 63.

I concur in the affirmance of the judgment against Peters but dissent from the reversal of No. 63, *Sibron* v. *New York,* and would affirm that conviction. Sibron was convicted of violating New York's anti-narcotics law on the basis of evidence seized from him by the police. The Court reverses on the ground that the narcotics were seized as the result of an unreasonable search in violation of the Fourth Amendment. The Court has decided today in *Terry* v. *Ohio* and in No. 74, *Peters* v. *New York,* that a policeman does not violate the Fourth Amendment when he makes a limited search for weapons on the person of a man who the policeman has probable cause to believe has a dangerous weapon on him with which he might injure the policeman or others or both, unless he is searched and the weapon is taken away from him. And, of course, under established principles it is not a violation of the Fourth Amendment for a policeman to search a person who he has probable cause to believe is committing a felony at the time. For both these reasons I think the seizure of the narcotics from Sibron was not unreasonable

under the Fourth Amendment. Because of a different emphasis on the facts, I find it necessary to restate them.

About 4 p. m. Patrolman Martin saw appellant Sibron in the vicinity of 742 Broadway. From then until 12 o'clock midnight Sibron remained there. During that time the policeman saw Sibron talking with six or eight persons whom the policeman knew from past experience to be narcotics addicts. Later, at about 12 o'clock, Sibron went into a restaurant and there the patrolman saw Sibron speak with three more known addicts. While Sibron was eating in the restaurant the policeman went to him and asked him to come out. Sibron came out. There the officer said to Sibron, "You know what I am after." Sibron mumbled something and reached into his left coat pocket. The officer also moved his hand to the pocket and seized what was in it, which turned out to be heroin. The patrolman testified at the hearing to suppress use of the heroin as evidence that he "thought he [Sibron] might have been" reaching for a gun.

Counsel for New York for some reason that I have not been able to understand, has attempted to confess error—that is, that for some reason the search or seizure here violated the Fourth Amendment. I agree with the Court that we need not and should not accept this confession of error. But, unlike the Court, I think, for two reasons, that the seizure did not violate the Fourth Amendment and that the heroin was properly admitted in evidence.

First. I think there was probable cause for the policeman to believe that when Sibron reached his hand to his coat pocket, Sibron had a dangerous weapon which he might use if it were not taken away from him. This, according to the Court's own opinion, seems to have been the ground on which the Court of Appeals of New York justified the search, since it "affirmed on the

basis of § 180–a, which authorizes such a search when the officer 'reasonably suspects that he is in danger of life or limb.' " *Ante,* at 63. And it seems to me to be a reasonable inference that when Sibron, who had been approaching and talking to addicts for eight hours, reached his hand quickly to his left coat pocket, he might well be reaching for a gun. And as the Court has emphasized today in its opinions in the other stop-and-frisk cases, a policeman under such circumstances has to act in a split second; delay may mean death for him. No one can know when an addict may be moved to shoot or stab, and particularly when he moves his hand hurriedly to a pocket where weapons are known to be habitually carried, it behooves an officer who wants to live to act at once as this officer did. It is true that the officer might also have thought Sibron was about to get heroin instead of a weapon. But the law enforcement officers all over the Nation have gained little protection from the courts through opinions here if they are now left helpless to act in self defense when a man associating intimately and continuously with addicts, upon meeting an officer, shifts his hand immediately to a pocket where weapons are constantly carried.

In appraising the facts as I have I realize that the Court has chosen to draw inferences different from mine and those drawn by the courts below. The Court for illustration draws inferences that the officer's testimony at the hearing continued upon the "plain premise that he had been looking for narcotics all the time." *Ante,* at 47, n. 4. But this Court is hardly, at this distance from the place and atmosphere of the trial, in a position to overturn the trial and appellate courts on its own independent finding of an unspoken "premise" of the officer's inner thoughts.

In acting upon its own findings and rejecting those of the lower state courts, this Court, sitting in the marble halls of the Supreme Court Building in Wash-

ington, D. C., should be most cautious. Due to our holding in *Mapp* v. *Ohio,* 367 U. S. 643, we are due to get for review literally thousands of cases raising questions like those before us here. If we are setting ourselves meticulously to review all such findings our task will be endless and many will rue the day when *Mapp* was decided. It is not only wise but imperative that where findings of the facts of reasonableness and probable cause are involved in such state cases, we should not overturn state court findings unless in the most extravagant and egregious errors. It seems fantastic to me even to suggest that this is such a case. I would leave these state court holdings alone.

Second, I think also that there was sufficient evidence here on which to base findings that after recovery of the heroin, in particular, an officer could reasonably believe there was probable cause to charge Sibron with violating New York's narcotics laws. As I have previously argued, there was, I think, ample evidence to give the officer probable cause to believe Sibron had a dangerous weapon and that he might use it. Under such circumstances the officer had a right to search him in the very limited fashion he did here. Since, therefore, this was a reasonable and justified search, the use of the heroin discovered by it was admissible in evidence.

I would affirm.