Wachtler, J. (dissenting).
I share the concern of the majority over the incidence of violent crime attributable to the presence of unlicensed weapons in our community, but I cannot agree that the warrantless search which the police officer conducted here was constitutional. It is apparent from the facts of this case that the search cannot be justified on any existing theory of law.
On September 8,1970, the defendant went to a police station in Queens County to file a formal complaint against Felix Dotson, the man with whom she had been living for approximately three years.
Her complaint was based on an incident which had occurred several minutes earlier. She claimed that while she was stopped at a traffic light Dotson had jumped into her car, grabbed her and menaced her with a knife. With the help of her 14-year-old brother she was able to free herself from Dotson’s grip and run to a nearby policeman. The officer arrested Dotson and told the defendant to proceed to the station house in her own vehicle to file formal charges against her assailant.
Later when they were in the police station, the officer walked up to her and asked for her purse. After the defendant surren *73 dered the handbag, the officer opened it and recovered a revolver. He asked her if she had a license for the gun and after she answered in the negative she was placed under arrest for possession of a loaded weapon.
It is not entirely clear from the record why the police officer conducted the search of the defendant’s poelcetbook.
At the suppression hearing the officer testified at length concerning a police department regulation which he claimed authorized him to search all parcels (including handbags) carried into the police station.[1] But he also testified that while transporting Dotson to headquarters, Dotson informed him that the defendant “ had a gun on her, she had no license or registration ” for the vehicle she was driving. The officer recalled that at this time they were approximately 10 city blocks from the station house. And although he was in a radio car directly behind the defendant’s vehicle he took no action on any of Dotson’s information. When this conversation was brought out on direct examination at the suppression hearing, the officer did not indicate that he credited this story or felt that the defendant posed a danger to his safety. However, when asked whether he had conducted the search of her handbag as a matter of routine, pursuant to the police department regulation, he answered that he had.
The hearing court concluded that “ The officer had probable cause to search the pocketbook of this defendant ”. This decision was affirmed without opinion by the Appellate Term but now it is urged by the majority that the search can be justified as a “ stop and frisk ”.
• I agree with the conclusion implicit in the majority decision that the search cannot be sustained on the probable cause theory. But I cannot agree that every search for a weapon is a “ stop and frisk ’ ’ or that every search in which a weapon is recovered may be cast in this mold in order to salvage evidence seized on mere suspicion. In short, I cannot agree that the circumstances of this case present another variation on the stop and frisk theme.
*74 In its pristine sense a frisk is a “ contact or patting of the outer clothing of a person to detect by the sense of touch if a concealed weapon is being carried (People v. Rivera, 14 N Y 2d 441, 446.) It is a procedure born of the exigencies of the “ street encounter ” or “ field interrogation ” which recognizes that in such circumstances “ [e]ven when the police officer has the upper hand, the tables are easily turned ”. (People v. Peters, 18 N Y 2d 238, 245.)
The stop and frisk concept, permitting a police officer to conduct a frisk on less than probable cause, was originally upheld by this court on the theory that it constituted “ a minor inconvenience and petty indignity ” involving something less than a search and would only be permitted when a police officer reasonably suspects that his life may be in danger. (People v. Rivera, 14 N Y 2d, at p. 447.)
It is now manifestly clear that a frisk for weapons is not a 1 ‘ minor inconvenience and petty indignity ’ ’ but is in fact a search within the meaning of the Constitution. (Terry v. Ohio, 392 U. S. 1, 16, 17.) Thus the fact that the police officer has acted on less than probable cause can no longer be justified on the ground that the individual has been subjected to something less than a constitutionally cognizable search.
The sole justification for the officer’s action must be his reasonable conclusion that “ the persons with whom he is dealing may be armed and presently dangerous ”. (Terry v. Ohio, 392 U. S., at p. 30.)[2] It is a “ narrowly drawn authority ” designed to be employed in the context of the ‘ ‘ rapidly unfolding and often dangerous situations on city streets ”. (Terry v. Ohio, 392 U. S., at pp. 10, 27.) And it follows that “ The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence ”. (Adams v. Williams, 407 U. S. 143, 146.) Absent this element of danger, the search cannot be justified. (Sibron v. New York, 392 U. S. 40.)
Here of course the police officer never stated that he conducted the search to protect himself. The majority’s conclusion then, *75 that the search falls within the scope of the “ stop and frisk ” doctrine, is based on the assumption that although the officer stated that he conducted the search pursuant to his understanding (or rather misunderstanding) of the police department regulation, it was in fact prompted by an unarticulated apprehension of immediate bodily harm.
In Sibron (392 U. S. 40, supra) the Supreme Court rejected the notion that the court may conjure up a sense of fear to justify the police officer’s actions when that conclusion conflicts with the officer’s own statements and is not borne out by the circumstances surrounding the search. In my opinion that is precisely what the majority seeks to do here.
The atmosphere of the search clearly could not have contributed to the sense of fear attributed to the police officer. For although the incident was initiated by an on-the-street encounter involving a domestic altercation, the officer was not called upon to respond in that context. The search was in fact conducted in the police headquarters. As far as the officer’s safety is concerned this is the very antithesis of the street encounter situation in which “ the tables are easily turned ”.
Nor can it be said that the defendant’s previous conduct led the officer to reasonably fear that if she were armed she would be “ presently dangerous ”. If she had not used the gun to repel her assailant when she was threatened with a knife, would it be reasonable to suspect that she would react to a police inquiry in the station house by resorting to violence?
Nor did the officer’s response to Dotson’s information evidence a sense of urgency indicative of fear. According to his testimony he was 10 blocks away from the police station, in the radio car, when Dotson told him that the defendant had a gun on her person, yet he did not radio ahead to seek assistance in disarming a person he “ felt ” posed a danger to his safety, or warn his fellow officers of her arrival. And although help was readily available in the station house he apparently chose to confront the defendant and disarm her alone.
From this the majority could, with some degree of logic, attribute to the police officer a motive to obtain evidence (see Sibron v. New York, 392 U. S. 40, supra), but I find no circumstances which would lead to the conclusion that the officer acted *76 out of a sense of fear or emergency generated by a “ rapidly unfolding and * * * dangerous situation”.[3]
*77 The sense of danger is to be found only in the rdinds of the majority and in their broad conclusion that danger flows not from the particular circumstances of each case but from the nature of the evidence sought. The fact is that they are carving out a totally novel exception to the prohibitions against unlawful search and seizure, dispensing with the need for probable cause whenever a police officer suspects that a person is violating one of the weapon laws of our State and seeks evidence to confirm that suspicion.
Although I share the majority’s desire to remove the threat posed by the presence of weapons, I do not believe that this should be accomplished by ignoring the protections of the Fourth Amendment. The strength of our constitutional protections meets its greatest test during these times of disorder. To discard or dilute these protections because of the exigencies of the times is a most dangerous practice. It is precisely during these times that we should be seeking -ways to reaffirm our constitutional guarantees rather than rationalizing them out of existence.
The conviction should be reversed and the information dismissed.
Judges Burke, Gabrielli and Jones concur with Judge Jasen ; Judge Wachtler dissents and votes to reverse in a separate opinion in which Chief Judge Fuld concurs; Judge Breitel taking no part.
Order affirmed.

. The regulation did not actually give the officer as much authority as he and the majority assumed. It stated: “All packages carried by an individual shall be examined before entrance is permitted. Anyone refusing to exhibit the contents of the package shall not be allowed to carry the package into a department building.” (emphasis added).

. The Supreme Court has consistently reiterated that in order to justify a “ stop and frisk ”, the officer must reasonably conclude that the suspect is “ armed and presently dangerous ”, Terry v. Ohio, 392 U. S. 1, 24, 27, 30; Sihron v. New York, 392 U. S. 40, 64; Adams v. Williams, 407 U. S. 143,146.

. In view of the fact that I would find the stop and frisk rationale inappropriate here, it has been unnecessary to consider some of the other problems posed by the majority decision. However I should note that there is a serious doubt that the officer was justified in acting on Dotson’s tip or that the scope of the search was warranted under the circumstances.
Reasonable suspicion prerequisite to a stop and frisk need not arise from the officer’s personal observations, but when he acts on an informant’s tip, there must be some “indicia of reliability” to justify the officer’s reliance on this information (Adams v. Williams, 407 U. S. 143, 147). In Williams the informant was known to the police officer, but here the officer had never seen Dotson until the date of his arrest. In People v. Arthurs (24 N Y 2d 688) we noted that the officer had received similar information from several informants, another factor which is not present here. In People v. Taggart (20 N Y 2d 335) the officer was able to verify some of the informant’s information. In the case at bar the informant supplied other information (concerning the vehicle and the appellant’s lack of a driver’s license) which could have been easily verified. However, the-officer did not attempt to do so until after the search.
The fact that the informant was identified to the officer, and was apparently personally acquainted with the defendant would under normal circumstances present a stronger case than an anonymous tip and carry “ enough indicia of reliability to justify ” a stop and frisk. (Adams v. Williams, 407 U. S., at p. 147.) But when the circumstances clearly demonstrate the informant’s obvious animosity toward the suspect and the nature of the information evidences a clear motive of vindictiveness, it is difficult to conclude that familiarity breeds reliability.
The fact that the information might soon be verified or disproven, as noted by the majority, could conceivably, if considered in the abstract, constitute some indicia of reliability. But that assumes that the informant is exercising normal foresight; an assumption which is unreasonable under the circumstances of this case. All the facts available to the officer indicate that Dotson had, for several days, pursued a course of conduct intended to annoy, harass and perhaps injure the defendant, heedless of the consequences.
It seems to me that the possibility of the malicious informant is one of the primary reasons for requiring that informant’s tips carry some indicia of reliability. And it is in these circumstances that I would require more, rather than less, verification of the volunteered information.
It is urged that the scope of the search is within the limits established by this court in People v. Pugach (15 N Y 2d 65) and People v. Taggart (20 N Y 2d 335). Those cases, however, were decided when this court was operating under the assumption that a limited frisk for weapons was beyond the perimeters of the Fourth Amendment. When the Supreme Court held otherwise in Terry v. Ohio (392 U. S. 1), they noted that this cast a cloud of doubt over prior New York law (Terry v. Ohio, 392 U. S., at pp. 12, 17, n. 15; see, also, Sibron v. New York, 392 U. S. 40, 61, n. 20). And although that court has since decided in *77 Adams v. Williams (407 U. S. 143, supra) that a frisk might include an initial intrusion into the clothing of the suspect, it was noted that the officer in that case had information from a person known to him indicating the exact location of the weapon. In the case now before the court the information which the officer possessed indicated only that the appellant had a gun “on her”; it did not specifically designate her pocketbook. Nor is there any evidence in the record indicating that the handbag was made of a material which would preclude an external frisk. In the absence of this it cannot be concluded that any effort was made to comply with the requirement that the scope of the search be “ reasonably limited * * * to the accomplishment of the only goal which might conceivably have justified its inception — the protection of the officer by disarming a potentially dangerous man.” (Sibron v. New York, 392 U. S., at p. 65.)