Fuchsberg, J.
(dissenting in People v De Bour and concurring in People v La Pene). In my view, by its affirmance of the conviction of Louis De Bour, the majority today sanctions detention by the police, without any articulable reason, of any person, no matter how innocent or innocent-appearing he may be, simply because, while walking along a city street at night, *227 he crosses from the sidewalk on one side of the street to the sidewalk on the other. In so doing, it drains a great deal of force from one of our most hallowed rights—the "right of the people to be secure in their persons * * * against unreasonable searches and seizures” (NY Const, art I, § 12; US Const, 4th Arndt).
The De Bour decision is no less disturbing because it is handed down in concert with a well-warranted reversal of the conviction in People v La Pene. For, curiously, the La Pene case, though it suffers from a fatal flaw, at least presents a well-articulated reason for the detention there—the report of an ongoing violation of the criminal law, information as to where the suspect was then to be found, and a description of the suspect by skin color and conspicuous shirt color, which, when added to the elements of time and place, provided the police with the coincidence of four verifiable facts before they detained the defendant. Though the anonymity of the source of the information, no matter how accurate it in fact turned out to be, disqualified it from serving as a basis for the intrusion on La Pene’s privacy (People v Taggart, 20 NY2d 335, 343), the verified facts, five in number if we include possession of the gun, were five more than existed in the De Bour case. A fortiori, De Bour should certainly be reversed, our court being called upon, far more than in La Pene, to act as "the instrument by which a free society imposes on itself the seldom welcome, sometimes dangerous, always indispensible restraints that keep it free” (Amsterdam, Perspectives on the Fourth Amendment, 58 Minn L Rev 349, 353).
Generally, for the fulfillment of that function, a balance needs to be, and long ago was, struck, a balance between society’s interest in encouraging law enforcement and society’s interest in fostering individual privacy and personal inviolability. (See Brinegar v United States, 338 US 160, 176.) In striking the balance, our Country might have elected to elevate aggressive and efficient police activity to a pre-eminent position. While such a model prevailed in many other societies, however, the founding fathers rejected it, believing—and history has amply borne them out—that the price in personal freedom which such a choice exacts far outweighs any transitory gains which would flow from a presumed increased capacity to enforce the law.
On the other hand, our Nation could have subordinated police activity to abstract notions of individual liberty at, of *228 course, a considerable social cost of its own. It did not adopt that course either, choosing a middle one instead.
Similarly, conflicting alternatives have been and, now in this case, are pressed upon us in the narrower area of investigative street encounters. Libertarians have argued that no police-citizen encounter should ever be permitted (including a brief investigative street encounter) in the absence of traditional probable cause, while law enforcement officials urge that the limited intrusion created by a brief investigative encounter justifies removing it from all constitutional constraints, thus authorizing unlimited street "stops” by the police. Again, we have accepted neither extreme. Instead, in Terry v Ohio (392 US 1), while the Supreme Court approved the concept of investigative street encounters on less than probable cause, it insisted that such an encounter be preceded by activity which gives rise to an "articulable suspicion” that criminal activity has, in fact, occurred (Terry v Ohio, 392 US 1, 31 [Harlan, J., concurring], supra). Thus, mere subjective hunch cannot justify a police-citizen encounter in the absence of objective evidence which would lead a reasonable person to suspect that criminal activity was afoot. The Terry court recognized that, unless such an objective standard is respected, no principled limitation would exist on the capacity of the police to accost our citizens, and a critical bulwark of liberty would be lost. Accordingly, the crucial question in this case is whether the initial investigative detention of appellant was justified by anything other than subjective hunch. Put another way, we must decide whether to validate and, thus, to encourage, police intrusions into the lives of people when triggered only by the kind of innocuous conduct which gave rise to the "stop” of the appellant here.
So measured, there was no reason for the police to confront De Bour. They lacked "probable cause”, "reasonable cause”, or, for that matter, any cause for his detention as he walked along the street, so to speak, minding his own business. They lacked any, that is unless a person’s act in choosing to cross a street when in sight of a uniformed police officer in and of itself may be said to give rise to an "articulable suspicion” of criminal activity (Sibron v New York, 392 US 40, 64; cf. Terry v Ohio, supra, pp 22-23). For, even if it be postulated that less evidence is needed to supply cause for a brief on-the-street detention than for taking an individual to the station, there still must be a recognizable and justifiable *229 cause (see La Fave, "Street Encounters” and the Constitution, 67 Mich L Rev 39, 54).
Indeed, it is interesting to note the complete absence of any rationale for the officers’ conduct, irrespective of whether such rationale could ever be a permissible basis for a compelled stop or not. De Bour was alone. He was on a public street. It was normally lit. The two policemen who accosted him had received no report that any crime had been committed, was being committed or was about to be committed in that area (cf. Adams v Williams, 407 US 143), nor did they have "reasonable grounds” to suspect De Bour of having committed one.* They were engaged in no ongoing search for a specific suspect whether resembling defendant or not, and they had not the slightest impression that defendant might be armed. Though, as the officer-witness testified, they were in search of narcotics violations and may have had a search of De Bour in mind in accosting him, they had no reason for suspecting that he possessed any drugs, as indeed he did not (cf. Sibron v New York, 392 US 40, 69, supra). There was nothing conspicuous, hurried or furtive in his walk, either before or after he started crossing the street, or even when the officers came toward him. Nor was there anything unusual in his attire. He carried no packages or other objects which could possibly invite curiosity. He had not loitered or engaged in any suspicious conduct. He did not try to avoid the officers as they crossed towards him. Though the police never gave him any reason for stopping and questioning him, he answered all their questions clearly, intelligently and responsively, to be sure as might have been expected of one who was then a college student and tutor. He had not been seen to violate any ordinance or other law. There was no reason for quick action to prevent injury to or destruction of evidence. Nor was the later claim of high incidence of drugs in the area where De Bour was stopped (see People v Davis, 36 NY2d 280) reason to permit his dragnet-like apprehension. In short, there was no degree of belief reasonably generated on which could be founded suspicion "that criminal activity may be afoot” (Terry v Ohio, 392 US 1, 30, supra).
There was not even any claim by the police that when they *230 stopped De Bour they were seeking to "control pedestrian or vehicular traffic” or were engaged in the "mediation of domestic and other noncriminal conflicts”, or were engaged in the "supplying of emergency help and assistance”, or making casual inquiry as to the time of day or direction of travel, or seeking to find "the parents of a lost child” or striking up a casual conversation or engaged in any other of the activities hypothecated by the majority. In short, the accosting, stopping and detention of De Bour when it occurred, and assuming it was not undertaken simply as an act of harassment, can have been nothing but "the product of a volatile or inventive imagination” (Terry v Ohio, 392 US 1, 28, supra) instead of the articulable suspicion of criminal activity that is the required precondition to any interference by the police with a citizen’s freedom of movement.
The obvious purpose of the "articulable suspicion” requirement is to place some meaningful check on the ability of the police to detain and question a person on the street. Were we content to entrust the protection of Fourth Amendment values to the subjective expertise of the police, no such requirement would ever have been promulgated. To a police officer, trained to be wary and conditioned to be suspicious, the act of crossing a street may seem questionable. However, it is certainly not the type of furtive activity which should authorize an intrusion into the life of a citizen. If merely crossing a street can justify police detention of a citizen for questioning, it is difficult to imagine what type of activity exists which would not authorize the initiation of such a confrontation. In a very real sense, the objective standard of "articulable suspicion” will have been gutted and replaced by little more than the existence of a subjective hunch. Were that to occur, we would have utterly subordinated Fourth Amendment values to law enforcement concerns by adopting the extreme law enforcement societal model which removes police-citizen street interrogations from any constitutional constraints.
The conclusion that there was such interference with De Bour is as inescapable as was the absence of cause. Even if we disregard the defendant’s own completely exculpatory testimony and confine ourselves, as we must for this purpose, to the testimony of the single one of the two uniformed and armed officers involved who took the stand, we find that his description of how he and his brother officer, command in their tone and authority in their approach, crossed directly *231 and deliberately into De Bour’s path for the purpose of intercepting him, contained the following unequivocal language: "I crossed over with my partner and we stopped him, stopped the man”. In answer to the direct question, "And at that point, at the time when you were asking him about what he was doing in the neighborhood, had you stopped his motion, had you caused him to stand still?” his answer was an unqualified "Yes” (emphasis added). At another point, the officer testified that when De Bour, who had been completely responsive to questions, including those as to his points of departure and destination, turned out not to be carrying any identification, which of course was no dereliction, one of the two police officers blocking his path moved behind him so that he was no longer just forcibly stopped but surrounded as well (cf. People v Allende, 39 NY2d 474; People v Cantor, 36 NY2d 106). And, at still another point, the officer-witness was uncertain whether his nontestifying partner had had his gun out before then, "He might have had it out”.
It is difficult to see how this compelled stop squares with the admonition that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized’ that person” (Terry v Ohio, supra, at p 16). And, since it is undisputed that, until after the stop, there was no cause for apprehension that the defendant possessed a weapon, the weapon disclosed by later search was within the protecting embrace of the exclusionary rule (People v Rodriquez, 11 NY2d 279, 286; cf. People v Malinsky, 15 NY2d 86), intended as it is to restrain the excessively zealous hands of well-intentioned persons who have forgotten that a good end does not justify an illicit means. Accordingly, the gun should have been suppressed. It is unnecessary therefore, on my view of the case, to determine whether, if there had been sufficient cause for the stop, the search which followed would have been lawful. When, but only when, the police have constitutional grounds to insist on detaining a citizen, there is the companion right to frisk a detainee in order to protect the officers against the presence of weapons. Suffice it to say that, even if such preconditions had prevailed, the legality of the search here is hardly beyond question. Though the bulge was only "slight” there was no frisk to ascertain its nature before defendant was compelled to open his jacket. This was especially odd since the male waistline is precisely in the area where thick quilted Air Force jackets of the sort defendant *232 was wearing tend to bunch and the clutter of contents contained in most men’s trouser pockets is located. And, among other things, while the officer testified at the suppression hearing that he found the gun after he ordered the defendant to open his jacket, the notation in his memorandum book, made on the occasion of the arrest, was that the gun was in plain view with the jacket already open, an inconsistency strongly suggesting, to say the least, improvisation of one or both of these versions.
Finally, I would state that the proscription of the Fourth Amendment is not dependent on the length of the detention. The liberty it guarantees is not quantitative; its essence is qualitative. It recognizes the fact that any unjustified and unauthorized interference with one’s freedom of movement is an impermissible imposition, for forced contacts with those looking for damaging information are not merely highly unpleasant but deeply disturbing to one’s sense of security. For the tone of life and spontaneity of spirit which characterizes a free society could not long survive uncontrolled police detention and search of the populace. I do not believe these are beyond our power—and our sworn duty—to prevent. If we do not do so, who effectively will "police the police”? (Reich, Police Questioning of Law Abiding Citizens, 75 Yale LJ 1161; La Fave, Improving Police Performance Through the Exclusionary Rule—Part I: Current Police and Local Court Practices, 30 Mo L Rev 391, 398-401.)
For these reasons, while I agree with the court’s disposition of the La Pene case, I dissent and would reverse in De Bour.
Chief Judge Breitel and Judges Jasen, Gabrielli and Jones concur with Judge Wachtler; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judge Cooke concurs.
In People v De Bour: Order affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli and Jones concur with Judge Wachtler; Judge Fuchsberg concurs in a separate opinion in which Judge Cooke concurs.
In People v La Pene: Order reversed, etc.

 Such are the minimal requirements of New York’s "stop-and-frisk” statute (CPL 140.50). Similar standards are enunciated in the Uniform Arrest Act (§ 2), see Warner, Uniform Arrest Act (28 Va L Rev 315, 343-347) and the American Law Institute’s Model Code of Pre-Arraignment Procedure (§ 110.2).