353 So.2d 870 (1977)
Robert P. SCHNEIDER, Appellant,
v.
STATE of Florida, Appellee.
No. 76-1990.
District Court of Appeal of Florida, Fourth District.
December 20, 1977.
Rehearing Denied January 31, 1978.
Richard L. Jorandby, Public Defender, and Jerry L. Schwarz, Asst. Public Defender, West Palm Beach, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, Richard P. Zaretsky and Benedict P. Kuehne, Asst. Attys. Gen., West Palm Beach, for appellee.
DAUKSCH, Judge.
Appellant raises as error the refusal of the trial court to grant his Motion to Suppress. We agree and reverse.
Between 6:00 PM and 6:30 PM in February the policeman was in his car in a supermarket parking lot and observed Appellant and another in a vehicle with an Ohio tag. The policeman testified:
"The first thing that drew my attention or maybe suspicion of the vehicle was the manner in which they were looking into the front of the Grand Union grocery store, the condition of themselves as well as the vehicle, and the out of State tag, made me suspicious of two persons possibly casing the store for whatever. And they seemed to be looking in the front area where I know the cash registers were at. .. . Subject Schneider was pretty much as he is now. The other party in the car, a Bruce Webster, was  looked as though he hadn't bathed in several days. He had a stubby beard, short beard, generally looked unkept.
Q Now, what about  you said something about the condition of the car. Can you describe that?
A Well, the out of State tag and no clothing in the vehicle. Usually, people *871 passing through town, they would have their suitcases or clothes... . The clothes hanging in the car, something of this nature would indicate they were traveling through. They didn't appear like they met that criteria as a person or people traveling. They looked like they were staying locally, something of this nature. Just in my experience and training, they just looked suspicious to me.
Q Now, what was the physical activity they were doing when you first saw them?
A They were looking in the store when I first saw them. Schneider, I believe, the driver, saw me, and I believe he must have said something or indicated something to the passenger who was really looking into the store the most. They both looked at me. I was coming in one entrance as they were  had come in another entrance, I had come in south. We had met by the front of the store. Schneider then seemed to pay a lot of attention straight ahead to his driving, not to make any mistake  not to draw my attention. Newman seemed to be looking back over, from the back seat, from the passenger side, trying to, what I felt  ...  trying to watch me to make sure what I was going to do and what my movements were. And I wasn't in a marked police unit.
Q Did you have the car  did you check the car out?
A Not at that point in time, other than to see the tag. Also, in passing, they didn't have any clothing, and their general appearance.
Q Did you subsequently follow this vehicle and stop it?
A Yes, sir. As they passed me, they proceeded south out of the small shopping center over to 40th Street, then east a matter of a half a block or so to Federal Highway, then south on Federal Highway. After observing all this, and my feelings, just an instinct, I felt they warranted being stopped and checked as a suspicious vehicle."
Evidently the passenger was known as either Webster or Newman.
After Appellant's car was stopped it was revealed he had no driver license so the policeman checked the license of the passenger in order to allow him to drive the car. The passenger had a license and the two were permitted to leave with Newman driving. Meanwhile the policeman had radioed for an NCIC check on the license tag of the car and the names of Appellant and Newman. The policeman permitted the pair to leave before receiving a reply from his computer check request. To make a long story short the policeman later received a "hit" on Newman who had the same name, etc., as someone wanted in Rhode Island for robbery. The policeman found the Appellant and Newman and took them to the station. A search of the car revealed hypodermic syringes and some prescription forms. Appellant was convicted of unlawful possession of narcotic paraphernalia.
The question on appeal is whether the initial stop was permissible and if not was all which followed tainted by the initial stop. Our answer is that the initial stop, as was stated by the policeman, was based upon a feeling, a suspicion, an instinct; not probable cause or even a well founded or reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The policeman stopped these men because they didn't look right. Thomas v. State, 297 So.2d 850 (Fla. 4th DCA 1974). See also the two Bailey cases. Bailey v. State, 295 So.2d 133 (Fla. 4th DCA 1974); Bailey v. State, 319 So.2d 22 (Fla. 1975).
Because the policeman was not within the law when he first stopped the Appellant all that was seized was a result of an unlawful search and seizure. Bailey, supra. Therefore the Judgment and Sentence are reversed.
REVERSED.
DOWNEY and ANSTEAD, JJ., concur.