Steven B. **ELLIS** and City of St. Matthews and City of Woodlawn Park, Appellants,

v.

Stephen J. **JORDAN**, Appellee.

**CITY OF WOODLAWN PARK**, City of St. Matthews, and Steven B. Ellis, Appellants,

v.

Stephen J. **JORDAN**, Appellee.

Court of Appeals of Kentucky.

April 7, 1978.

Rehearing Denied June 2, 1978.

Discretionary Review Denied Oct. 24, 1978.

C. Alex Rose, Louisville, for Steven B. Ellis and City of St. Matthews.

Woosley M. Caye, Louisville, for City of Woodlawn Park.

Thomas A. Dockter, Richard D. Heideman, Louisville, for appellee.

Before HOWERTON, LESTER and WHITE, JJ.

LESTER, Judge.

This appeal arises from a judgment based upon jury verdict for compensatory ($4,000.00) and punitive ($1.00) damages rendered against the appellants occasioned by appellee's complaint for false arrest and false imprisonment.

Stephen J. Jordan, a former resident of Waynesville, Ohio, was an employee of the United States Army Corps of Engineers whose duties required him to be in the Jefferson County area during a portion of October, 1974. While so engaged, Jordan was temporarily staying at a residence in the community of Woodlawn Park which is

adjacent to the City of St. Matthews, a municipal corporation of the fourth class. The home was occupied by Mary Ann Goodwyn whose estranged husband was Frank Goodwyn, a fellow employee of appellee's both of whom had been long-time friends of Jordan.

Appellant, Steven B. Ellis, was a member of the regular police department of St. Matthews, who was referred to in the testimony as a twenty-four hour patrolman because he kept the city's cruiser in his possession around the clock.

On October 28, 1974, appellee and Frank Goodwyn decided to get something to eat. Mary Ann testified they left her house between 2:00 P.M. to 3:00 P.M. while Jordan maintains the time was around 7:00 P.M. to 7:30 P.M. The pair went to the Pizza Hut on Shelbyville Road where they ate and Jordan had one or two beers. Leaving the restaurant, they travelled to a local bistro known as Dutch's Tavern arriving there sometime between 8:00 P.M. and 9:00 P.M. whereat they indulged in a bit of malt beverage consumption. Appellee admitted having consumed four or five beers while Goodwyn's recollection on the particular point was "cloudy". Close to midnight, Frank drove his friend back to Ashland Avenue in Woodlawn Park and stopped the car about four doors from his wife's house, and for some undisclosed reason, they turned the dome light on.

During the late evening of October 28, 1974, appellant, Ellis, had been working on an assignment for the St. Matthews Police Department in civilian clothes. He was armed and had his handcuffs with him. In order to get from his place of employment to his home, it was necessary for Ellis to travel through a portion of Woodlawn Park, and upon termination of his duties on the night in question, he was driving along Ashland Avenue at about the same time Jordan and Goodwyn were sitting in the latter's car with the interior light on. The sight aroused the officer's "curiosity", and so after passing the stopped car, he turned around and proceeded in its direction. While Ellis was doing this, appellee Jordan

alighted from Frank's vehicle and started to walk to Mary Ann's house, and Frank drove away.

Having set the scene, we now come to the actual confrontation that resulted in three court actions and this appeal.

Officer Ellis pulled his cruiser to within a short distance of appellee. There is a diversity of opinion as to whether the headlights were on or not with Jordan saying they were not and Ellis agreeing with him at one point while later stating that not only were they on but also that the spotlight was on the appellee. For that matter, there are two distinctive views as to the parties' demeanor which vary from appellee's description of himself as sober and apprehensive of the unidentified stranger's approach to Ellis' view that Jordan was "incoherent", "babbling", "clumsy", "abusive" and had the "smell of alcohol all over him." Both asked each other for identification. Jordan said Ellis refused to make any available while Ellis says that he had his badge in his hand. Appellee denies seeing it or that appellant told him he was a policeman. In any event, the officer searched Jordan by leaning him against the cruiser for the purpose of determining if there were any weapons present. Ellis maintains that appellee attempted to hit him while Ellis was patting him down. On the other hand, Jordan testified that appellant drew his gun from his waistband, cocked it, and held it to appellee's head. Ellis denies this portion of the story.

The officer handcuffed Jordan, put him in the rear of the cruiser with the seat belt around him, and after charging him with being drunk in a public place and disorderly conduct, lodged him in the Jefferson County jail. On November 18, 1974, appellee was convicted upon an amended charge of breach of the peace which he appealed to the Jefferson Circuit Court resulting in a dismissal of the charge. This civil litigation followed. The trial court directed the jury to find that an assault and battery and a false imprisonment had been committed upon the plaintiff below since Ellis had searched Jordan before he told him he was

under arrest. On the other hand, the jury found that appellee had committed the misdemeanor of drunk in a public place and/or disorderly conduct in the presence of appellant and that there was no false arrest or imprisonment. The jury next determined, under the court's instructions, that Ellis used no more force than was necessary in transporting Jordan to jail. In addition to the compensatory damages of $4,000.00 under the directed verdict for assault and battery, the panel awarded $1.00 in punitive damages. Finally, the jury concluded that Ellis was acting on behalf of both appellant cities.

At the conclusion of plaintiff's case, all defendants moved for directed verdicts, and after trial, all moved for judgment notwithstanding the verdict. In part, all of the motions had as their foundation the question of agency, and it is upon that issue of law that we must reverse as to the cities.

■ The doctrine of respondeat superior applies to the liability of a municipality the same as it does to any other corporation or individual, and it must therefore appear that the agent was acting within the scope of his authority at the time the act complained of occurred. 57 Am.Jur.2d *Municipal, School, and State Tort Liability* § 88 at 99 and 63 C.J.S. *Municipal Corporations* § 757 at p. 45. Moreover, in 57 Am.Jur.2d *Municipal, School, and State Tort Liability* § 254 at 221, we note that a municipality may or may not be liable for acts done or injuries inflicted by an off-duty policeman, depending on whether the policeman was acting in furtherance of the municipality's business and incident to the performance of his duties. Where, however, the act was clearly not in furtherance of municipal business, there is no liability on the part of the city. There can be no argument with the facts that Ellis was "off-duty" as related to his employment with St. Matthews and that what he did in connection with the Jordan affair certainly was not in the furtherance of the municipal business of appellant St. Matthews. Moreover,

A municipality is not liable for an assault and battery committed by a policeman beyond the territorial limits of the municipality. See 57 Am.Jur.2d *Municipal, School, and State Tort Liability* § 246 at 215.

We do not subscribe to the foregoing principle in all situations, but we consider it applicable under the circumstances where the officer is off-duty. It must be remembered that St. Matthews employed Ellis to perform police functions in that city and not in Woodlawn Park, either on or off-duty. We have closely examined the kinds of conduct necessary to bring an act within a scope of employment as set forth in *Restatement (Second) of Agency* § 229 (1958) and have concluded that nothing done by Ellis would impose any responsibility upon St. Matthews.

■ We now turn to the liability of Woodlawn Park. Woodlawn Park employs only one police officer, Chief Jerry Melloy. On a single occasion and in the course of a casual conversation, Chief Melloy discussed with Ellis his (Ellis') homebound route from St. Matthews through Woodlawn Park and indicated to Ellis that while so traveling

. . . he would appreciate it if we would take a look in or cut through, drive through the city as it was a fairly easy cut through on that end of town, to drive through the city and take a look at things, and if we saw anything out of the ordinary, let him know. (Deposition of appellant Ellis).

Chief Melloy neither requested Ellis to take any action whatsoever or make any arrests or function as a law enforcement officer of Woodlawn Park. Based upon the above mentioned conversation and certain facts not related to the creation of principal and agent, appellee urges this court to hold as a matter of law that the agency was created. We hold as a matter of law that it was not.

■ It requires no citation of authority to state that a city of the fifth or sixth class designates or appoints police officers through its legislative body and that there is no authority, expressed or implied, conferred upon a chief of police to employ officers or, in other words, to create a principal-agent relationship on behalf of the

municipality. Even a fleeting glance at *Restatement (Second) of Agency* § 220 (1958) and the comments thereunder would have made it abundantly clear that Ellis was not an employee, officer, or servant of Woodlawn Park, and we must accordingly reverse the judgment as to that appellant.

We believe one word is necessary concerning submission of the question of agency to the jury. In *Restatement (Second) of Agency* § 220 (1958) in Comment C to Subsection (1) at 487 we find:

> If the inference is clear that there is, or is not a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to matters of fact to be considered.

The law, as we have discussed above, is clear that the appellant cities had no master and servant relationship with Ellis at the time he arrested Jordan, but if other inferences could have been drawn and the matter properly submitted to the jury, the instructions should have set forth the factual matters to be considered by that panel. The present record reveals that no pertinent facts to be deliberated were submitted on the question of agency.

Having disposed of the corporate appellants, we now direct our attention to police officer Ellis. The court directed a verdict against him upon the theory that he had committed an assault and battery and falsely imprisoned Jordan because he came into physical contact with him prior to informing him verbally that he was under arrest. On the other hand, the jury found, under another instruction, that Jordan had committed the offense of drunk in a public place and/or disorderly conduct in the presence of Ellis and that the arrest was lawful. The only way these two apparently inconsistent verdicts can be reconciled is that the court distinguished what happened before the utterance of the words denoting the arrest from what took place thereafter. The entire incident could have consumed no more than a minute, and we quote the officer's version as repeated in appellee's brief:

> I then told him if he didn't give me some identification or at least explain why he was there, I could place him under arrest for nothing less than being drunk in a public place.

AND:

> I told him I was going to put him on the fender, pat him down and see if he had any weapons.

FURTHER:

> While I was patting him down, I had stooped down and was patting the legs of his trousers, he then violently jerked around with his right arm swinging back over my head as I was crouched down. As he did this I came back with my right hand and took his right hand and put it against the small of his back, leaning him forward over the vehicle. He was struggling and cursing and shouting.
>
> I reached in my waistband and took out my handcuffs with my left hand. I advised him I was placing him under arrest at this time for disorderly conduct and being drunk in a public place.

Appellee cites *Sibron v. State of New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) as authority that a search incident to a lawful arrest may not precede the arrest and serve a part of its justification. In the case at bar, the search did not serve as justification for the arrest because the probable cause for Jordan's apprehension was that he was committing an offense in the officer's presence. *Sibron, supra,* stands for the principle that a law enforcement agent, absent probable cause, cannot first search an individual and then, based upon the fruits of that search, place him under arrest. We are not faced with those circumstances in the case at bar. The fact that Jordan's conviction was reversed upon appeal is no evidence of lack of probable cause. *Reid v. True,* Ky., 302 S.W.2d 846 (1957). Moreover, officer Ellis merely patted down the appellee and did not conduct a general exploratory search by invading the clothing of plaintiff below, and there is a distinction between the two types.

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In this last mentioned case, the Chief Justice went on to point out that the limitations upon protective seizure and searches for weapons should be developed in the concrete factual circumstances of individual cases.

Since appellant had justification for arresting Jordan, we must now determine when the seizure of his person was made. In *Terry, supra,* the Court said:

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.

In the present litigation, not only did Ellis advise the appellee that he could place him under arrest, but he did in fact do so by restraining his liberty when he placed him against the fender of the cruiser. Arrests are not made in a check list procedure similar to starting an aircraft, and since we believe that appellee was under arrest at such time as appellant placed him against the cruiser, then the directed verdict as to Ellis must be reversed.

Appellants tendered instructions to the court which were rejected. The record is not clear whether the trial judge dictated his own instructions while the several attorneys were present, but at the time objections thereto were raised, they had not been reduced to written form. The court advised counsel that once they had been typed that he would entertain no further objections, and the attorneys had to be satisfied with attempting to make their exceptions known from what the court's secretary read to them from her notes. The lawyers complained that they could not adequately make proper complaint if they could not see the *written* documents, but the court believed it was unnecessary that they have them. The transcript would indicate that the in-chambers conference occurred during a late afternoon after both sides had rested their cases and the jury was instructed upon the opening of court the following morning.

We must remind the interested parties that C.R. 51 requires at subsection (2) in part that

> . . . the court *shall* show the parties the *written* instructions it will give the jury . . . (emphasis added)

The use of the word "shall" makes the rule mandatory, and it is our opinion that the *written* instructions must be given to the attorneys prior to submission to the jury.

For the reasons herein stated the circuit court should have sustained the motions of the several appellants for judgment notwithstanding the verdict, and it is hereby directed to do so.

The judgment is reversed.

All concur.