## A95A1006. PACE v. THE STATE.
(466 SE2d 254)

BEASLEY, Chief Judge.

Charles Pace was convicted of possession of cocaine with intent to distribute. In his sole enumeration of error, Pace asserts the trial court erred in denying his motion to suppress evidence which he contends was the result of an illegal detention and search.

The evidence in favor of the trial court's ruling is construed most

§§ 9-3-71; 9-11-6 (a); *Sanders v. Allstate Ins. Co.*, 207 Ga. App. 461 (1) (428 SE2d 575) (1993).

favorably to uphold the judgment. *State v. Corley*, 201 Ga. App. 320 (411 SE2d 324) (1991).

Two officers were patrolling in a car at 9:00 p.m. and included some apartments which were checked frequently because of the drug and prostitution activity there. One of the officers, who was a detective in the vice and narcotics squad, had seen drug transactions at this location, had made drug arrests there himself, and had seen other drug arrests made there. The officers saw defendant, who was standing in the parking lot. He stood there, alone, for about eight minutes before the officers approached him in the car. He did not seem to be waiting to meet anyone or to go inside, so they were suspicious that he was there to sell drugs to drivers-in, the scenario known as "stop and cop."

When they drove up to defendant in the marked police car, with them in uniform, he looked at the vehicle and turned around and started to walk away, towards the "porch" (a cement slab) of an apartment, at an angle towards the rear of the apartments. They exited the car and called for him to come to the police car. He began acting very nervous and continued to walk away but they walked up to him and he reached towards his right pocket and attempted several times to reach into it. They stopped him from going into the pocket because they were concerned for their safety, knowing that if a suspect is intent on harming the police it will be done with something in his hands. They feared he was going for a weapon. The detective, who had seen suspects pull weapons on officers with quick movements from their pockets, reached down and stopped the hand from going all the way into the pocket. They asked him to put his hands on the police car, and the officer reached into the pocket and found the razor blade and drugs. The officer wanted to remove what he thought would be a weapon. He testified that "he (defendant) was obviously reaching for something that we felt was a threat to us."

They did not do a pat-down first, although the officer testified at the motion hearing that they did a pat-down after they placed him on the vehicle, and at first testified at trial that they did a pat-down before they "put him on our vehicle." He made clear at trial that no pat-down occurred before the search of defendant's pocket. The legal analysis thus is not based on whether they felt a weapon or what they thought was a weapon. The search of the pocket was prompted not by a tactile detection by the police, but by defendant's actions, which alerted them to thinking he was retrieving a weapon. They reasonably believed that their safety had already been demonstrably compromised, just as it would have been if they felt what could have been a weapon. Defendant did have a razor blade (and a piece of cellophane with nine pieces of crack cocaine).

The officers did have a right to stop Pace from going into the

pocket; they explained amply why they did it. The law permits law enforcement officers to protect themselves from harm even when conducting a non-coercive lawful stop. Their safety is entitled to assurance at that stage just as well. " ' "The key question in all cases remains whether the protective measures taken by the officer were reasonable under the circumstances." (Cits.)' [Cit.]" *Chaney v. State,* 207 Ga. App. 72, 73 (427 SE2d 63) (1993). " ' "An officer may take appropriate self-protective measures when he lawfully confronts an individual and reasonably believes him to be armed or otherwise dangerous to the officer or others. The usual police response will be to conduct a frisk, patting the individual's clothing in search of a weapon. (Cits.)" ' " Id. at 72-73. A pat-down is not a prerequisite, however. *Hayes v. State,* 202 Ga. App. 204, 206 (414 SE2d 321) (1991). In *Hayes,* intrusion into a pocket based upon safety concerns and defendant's behavior, rather than what was felt in a pat-down, was upheld; defendant turned away when a pat-down reached a certain pocket; he was told to place his hands on the car and the officer then reached into the pocket without feeling it first.

" 'Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief "seizures" that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.' " *State v. Davis,* 206 Ga. App. 238 (424 SE2d 878) (1992). Under the first tier, a police officer may approach an individual and ask a few questions without triggering Fourth Amendment scrutiny. *State v. Westmoreland,* 204 Ga. App. 312 (1) (418 SE2d 822) (1992). See also *Sabel v. State,* 248 Ga. 10 (1) (282 SE2d 61) (1981). Accordingly, the officers were authorized to pull into the parking lot and ask Pace what he was doing. See *Ward v. State,* 193 Ga. App. 137 (1) (387 SE2d 150) (1989); *Vance v. State,* 205 Ga. App. 201 (421 SE2d 730) (1992).

In order for an officer to protect himself from injury, there need not first be established a reasonable, articulable suspicion that the person who is being lawfully questioned has committed or is committing a crime. The risk of injury justifies reasonably tailored protective reaction to a citizen's threatening action even in "tier-one" investigative encounters. Were it not so, the cost would be too high for such encounters. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio,* 392 U. S. 1, 23 (88 SC 1868, 20 LE2d 889) (1968). Whether a limited protective search of the person is justified requires a reasonable belief that the officer's safety or that of others is in danger. *Terry,* supra at 27.

The following "safety search" cases illustrate other circumstances

in which weapon searches were ruled reasonable and thus permitted. In *Louis v. State*, 196 Ga. App. 276 (396 SE2d 25) (1990), defendant was in a phone booth next to a car where others were engaged in drug activity. He turned his back to the officers and reached for his crotch, where the officers knew weapons are often concealed. In *Clark v. State*, 131 Ga. App. 583 (2) (206 SE2d 717) (1974), it was held: "When the detective advised defendant at the scene that he was a police officer, and defendant reached in his pocket, the detective had a right to stop and frisk defendant in order to protect himself," citing *Terry*.

The question is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, supra at 27. See also *Michigan v. Long*, 463 U. S. 1032 (III) (103 SC 3469, 77 LE2d 1201) (1983). The officer was "able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U. S. 40, 64 (88 SC 1889, 20 LE2d 917) (1968).

The officer invaded the pocket with his hand only when he had a reasonable belief that defendant was reaching for a weapon, based on all the circumstances described above, including defendant's efforts to avoid the police and then nervously seek something from his pocket. The belief, objectively, was not merely the product of an "inventive imagination," nor was the search "an act of harassment." *Terry*, supra at 28. The detention was effected in order to determine whether a weapon was within defendant's reach and control. It was a limited and appropriately directed reaction, prompted by the citizen's hand movements in the context of all the surrounding circumstances when the officers tried to communicate with him.

The officers were acting lawfully when they sought to ask Pace what he was doing. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, [cits.]; ask to examine the individual's identification, [cits.]; . . . — as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U. S. 429, 434-435 (111 SC 2382, 115 LE2d 389) (1991). Here the questioning had not even commenced; the officer had just asked defendant to stop when he escalated the general safety hazard to which police are subjected and created a specific one by attempting to retrieve what was in his pocket. This justified the limited intrusion.

*Judgment affirmed. McMurray, P. J., Birdsong, P. J., Pope, P. J., and Andrews, J., concur. Johnson, Blackburn, Smith and Ruffin, JJ., dissent.*

RUFFIN, Judge, dissenting.

The majority sets out three tiers of police-citizen encounters and

concludes that although this case involved a tier one encounter, the personal security of the police officers justified their search of Pace. While I agree with the majority that a police officer's right to personal security is of great importance, I respectfully dissent because I disagree that the officers' search was lawful in this case.

I also agree with the majority that under the first tier, a police officer may approach an individual and ask questions without triggering Fourth Amendment scrutiny. *State v. Westmoreland*, 204 Ga. App. 312 (1) (418 SE2d 822) (1992). See also *Sabel v. State*, 248 Ga. 10 (1) (282 SE2d 61) (1981). While I am troubled by the fact that the officers decided to question Pace based *solely* on their observation of him standing alone in an apartment complex parking lot for a full eight minutes, under existing precedent I am constrained to agree with the majority that there was nothing wrong with the officers pulling into the parking lot and asking Pace what he was doing. But we must also determine whether the officers' subsequent conduct was likewise lawful.

In *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), the United States Supreme Court examined the scope of a police officer's power to seize and search a citizen without probable cause for arrest. Id. at 16. The Court initially found that "there is 'no ready test for determining reasonableness [of an officer's actions] other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.' [Cit.]" Id. at 21. The Court warned against treating such a search as a "petty indignity," and indeed described it as "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Id. at 17. We all agree that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." Id. at 24-25. Accordingly, the Court in *Terry* emphasized that in reviewing such cases, courts must guard against police conduct "which trenches upon [an officer's] personal security without the objective evidentiary justification which the Constitution requires." Id. at 15. Importantly, the Court required that "in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Emphasis supplied.) Id. at 21.

In *Terry*, the necessary justification was established when a police officer observed three men walk alternately along an identical route, pausing to stare in the same store window approximately 24 times and where each completion of the route was followed by a conference between the men on a street corner. In light of this evidence,

the Court concluded that "where a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous[,] . . ." and where nothing in the course of his investigation dispels his reasonable fear for his own safety, he is entitled to a limited search of the individual. (Emphasis supplied.) Id. at 30. While the Court in *Terry* only required specific and articulable objective evidence of unusual conduct related to criminal activity, it noted that "[t]here is nothing unusual in two men standing together on a street corner, perhaps waiting for someone." Id. at 22.

As clarified by Justice Harlan in his concurring opinion in *Terry*, "if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty . . . to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." *Terry*, supra at 32-33. See also Lafave, Search & Seizure (2d ed. 1987), Vol. 3, pp. 499-501 § 9.4, and authorities cited.

In *Sibron v. New York*, 392 U. S. 40 (88 SC 1889, 20 LE2d 917) (1968), cited by the majority, the officer's justification for searching the defendant was found by the Court to be unreasonable. As in this case, in *Sibron* the officer was not acquainted with the defendant and had no information concerning him. The officer merely saw the defendant talking to a number of known narcotics addicts over a period of eight hours. The Court emphasized that the officer "was *completely ignorant* regarding the content of these conversations, and that he *saw nothing pass between [the defendant] and the addicts.* So far as [the officer] knew, they might indeed 'have been talking about the World Series.'" (Emphasis supplied.) Id. at 62. The Court in *Sibron* concluded that "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." Id.

In light of the above authority, I now turn to the facts of this case in search of some specific and articulable objective evidence of unusual conduct related to criminal activity. One of the officers testi-

fied that Pace was stopped because "he was making no attempt to go inside. He was obviously, . . . it's a known drug area. He was loitering in the parking lot and seemed to have no purpose for being there." The officer further testified that although he did not see any criminal activity occurring, and didn't know what Pace's intentions were, he "suspected that [Pace] may be up to something. . . ."

"That [the officer's unparticularized suspicion] about [Pace] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, ex post facto, a seizure that was not objectively reasonable at its inception." (Punctuation omitted.) *Rogers v. State*, 206 Ga. App. 654, 659 (3) (426 SE2d 209) (1992). There is simply nothing unusual about a man standing alone in an apartment complex parking lot for eight minutes. As in *Sibron*, the officers in this case were *completely ignorant* regarding the reason Pace was standing in the parking lot. There was absolutely no evidence that the officers were acquainted with Pace or had any information concerning him. Not only did they not see Pace hand anything to any other individual, they did not even see him interact with any other individual. I can think of numerous legitimate purposes for standing alone in an apartment complex parking lot, and so far as the officers knew he might have been waiting for a ride. See *Sibron*, supra; *Terry*, supra.

Again, I agree with the majority that a police officer's safety is of utmost concern, but we cannot view that concern in a vacuum. Also at stake is a citizen's constitutional right to be free from unreasonable searches and seizures. While I agree with the majority that "[t]he key question in all cases remains whether the protective measures taken by the officer were reasonable under the circumstances[,] . . ." courts cannot reach that question unless it is first established that there is specific and articulable objective evidence of unusual conduct related to criminal activity. *Chaney v. State*, 207 Ga. App. 72, 73 (427 SE2d 63) (1993). Indeed, before we even reached what we described as the "key question" in *Chaney*, we first established that the officers had "a reasonable, articulable suspicion" that the defendant was engaged in criminal activity. Id.

Because the officers in this case had no specific and articulable objective evidence of unusual conduct related to criminal activity, I conclude that the evidence obtained in the search should have been excluded and Pace's conviction should be reversed.

However, that is not the only disagreement I have with the majority's opinion. The majority mentions that the officers did not conduct a pat-down before pulling the contraband out of Pace's pocket, but states that this fact was not considered in its analysis. In my view, however, that fact makes a crucial and important difference in the legal analysis.

*Terry* allows only a "carefully limited search of the *outer* cloth-

ing" of a suspect. (Emphasis supplied.) *State v. Sapp*, 214 Ga. App. 428, 430-431 (2) (448 SE2d 3) (1994). Presented recently with a similar factual situation, a majority of this court held that under *Terry*, where circumstances permit and the officers' safety is not compromised, a two-step process *must* be followed: an officer *must first* perform a non-intrusive pat-down before the second step of intruding beneath the surface of the detainee's clothing. *Barrett v. State*, 212 Ga. App. 745 (443 SE2d 285) (1994). Because the officers in *Barrett* omitted that first step and reached into the accused's sock to examine a "bulge" without first performing a pat-down, a majority of this court found that the contraband had been illegally seized.

The dissent in *Barrett* raised the same concerns for the officers' safety that are raised by the majority here. In my view, under the circumstances here presented those concerns are unwarranted. Pace was under the officers' control when he was searched; the threat posed by his reaching for his pocket had been neutralized. Before searching Pace, the officers placed him up against the police car; he was no longer free to reach into his pocket.

Even assuming a genuine concern that the pocket contained a weapon, these circumstances mandated a pat-down before reaching into Pace's pocket. Clearly, it could have been done without endangering the officers. Under *Terry*, a pat-down was the necessary first step; the officers admitted none was performed until *after* they had reached into Pace's pocket. Thus, for this reason also, the contents of Pace's pocket were removed illegally and should have been suppressed.

I am authorized to state that Judge Johnson and Judge Blackburn join in this dissent.

SMITH, Judge, dissenting.

Although I agree with much that is said in Judge Ruffin's dissent, I cannot agree that the stop of Pace was unlawful under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

I do agree that the officers exceeded the bounds of *Terry* when they reached into Pace's pocket without performing a pat-down for weapons. *Barrett v. State*, 212 Ga. App. 745 (443 SE2d 285) (1994), was decided less than two years ago and presented a similar factual situation. I find any distinctions between this case and *Barrett* to be without a difference, and I find that this Court's inconsistent treatment of the two cases renders a disservice not only to Pace, but to the bench and bar. Accordingly, I respectfully dissent.

Decided December 5, 1995 —
Reconsideration denied December 20, 1995 — 

*Robert L. Wadkins*, for appellant.
*Douglas C. Pullen, District Attorney, George E. Lipscomb II, Assistant District Attorney*, for appellee.