

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00017-CR

FRANKY LYNN HATCHER　　　　　　　　　　　　　　APPELLANT

V.

THE STATE OF TEXAS　　　　　　　　　　　　　　　　STATE

----------

### FROM THE 415TH DISTRICT COURT OF PARKER COUNTY
### TRIAL COURT NO. CR07-0212

----------

### MEMORANDUM OPINION[1]

----------

In October 2007, a jury convicted Appellant Franky Lynn Hatcher of deadly conduct and assessed his punishment at ten years' confinement but recommended community supervision. The trial court followed the jury's recommendation, set Appellant's sentence at ten years' confinement, suspended imposition of the sentence, and placed him on community supervision for eight

---

[1]See Tex. R. App. P. 47.4.

years. In June 2014, the State filed a motion to revoke Appellant's community supervision, alleging only one violation: that he had committed a new criminal offense of cruelty to nonlivestock animals.[2] Specifically, the State alleged that "on or about the 17th day of March, 2014," Appellant

> intentionally, knowingly, and recklessly torture[d] or in a cruel manner kill[ed] . . . a black cat by beating it with a piece of wood, and [Appellant's] conduct was not a generally accepted and otherwise lawful form of conduct occurring solely for the purpose of or in support of fishing, hunting, or trapping; or wildlife management, wildlife or depredation control, or shooting preserve practices as regulated by state and federal law; or animal husbandry or agriculture practice involving livestock animals.

After a hearing, the trial court found this sole allegation true, revoked Appellant's community supervision, and sentenced him to four years' confinement, with credit for time served.

Given the length of his sentence, his large amount of credit for time served, and the date of this opinion, we have gleaned from the record that Appellant has probably been released. We do not dismiss this appeal as moot, however, because of the potential collateral consequences.[3] Specifically, in Texas, a probated sentence is not final and therefore cannot be used for enhancement purposes until community supervision is revoked unless a statutory

---

[2]*See* Tex. Penal Code Ann. § 42.092(b)(1) (West 2011).

[3]*See Sibron v. New York*, 392 U.S. 40, 57, 88 S. Ct. 1889, 1900 (1968); *Ex parte Burt*, 499 S.W.2d 109, 110 (Tex. Crim. App. 1973).

exception applies.[4]  Thus, a reversal of this revocation could potentially benefit

Appellant by making his offense of deadly conduct unavailable for enhancement

purposes.  But that reversal is not to be.

In one issue, Appellant contends that the trial court abused its discretion by

revoking his community supervision because the evidence did not establish his

guilt of the new offense by a preponderance of the evidence.  We hold that the

trial court did not abuse its discretion by revoking Appellant's community

supervision, and we therefore affirm the trial court's judgment.

We review an order revoking community supervision under an abuse of

discretion standard.[5]  In a revocation proceeding, the State must prove by a

preponderance of the evidence that the defendant violated the terms and

conditions of community supervision.[6]  The trial court is the sole judge of the

credibility of the witnesses and the weight to be given their testimony, and we

review the evidence in the light most favorable to the trial court's ruling.[7]  If the

State fails to meet its burden of proof, the trial court abuses its discretion in

---

[4]*See Donaldson v. State*, 476 S.W.3d 433, 438–39 (Tex. Crim. App. 2015); *Ex parte White*, 211 S.W.3d 316, 319 (Tex. Crim. App. 2007); *Ex parte Langley*, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992).

[5]*Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984).

[6]*Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993).

[7]*Cardona*, 665 S.W.2d at 493; *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. [Panel Op.] 1981).

revoking the community supervision.[8]

The State's only evidence, State's Exhibit 1, was a disk containing photographs and an offense report related to its sole allegation in the motion to revoke. Defense counsel stated, "No objection," to the exhibit's admission, and the trial court admitted it.

In his written statement, Christopher Smith, Appellant's ex-brother-in-law, told the police that he was in the restroom when he heard banging on his front porch. He looked out the front door and saw Appellant holding the cat by its tail, taking it to the dumpster. Smith believed that Appellant had used the front piece of wood off of a drawer on the porch to kill the cat. Smith told the investigating officer, Deputy T. Wolf, that Appellant lived two trailers down from him.

Smith also told Wolf that he went outside and saw a bloody spot on the stairs to his home, a larger, bloody spot on the rocks near the walkway, and a blood trail from the larger spot to smaller spots of blood near the vehicles. Smith saw the black cat in the blue trash dumpster. Smith told Wolf that Appellant thought cats were "[e]vil" and that they were "going to eat their brains then their food."

In his written statement, Appellant told the police,

> I took my trash down to the dumpster and noticed that there was a stray sick cat at my brother[']s house, so I picked up a p[ie]ce of wood and hit it on the head and put it out of its misery, so it wouldn't get the other cats at his house sick. It was no big deal

---

[8]*Cardona*, 665 S.W.2d at 493–94.

4

because it was sick, and then I just put it in the trash in the dumpster.

Appellant told deputies that he killed the cat because it "had a convict in [its] brain and was under the influence of undertow."

At the hearing, Appellant testified that he "picked up a board and . . . hit [the cat] in the head three times until it stopped wiggling, and [then he] threw it in the dumpster."  Appellant said the cat "was sick[;] that's why [he] put it out of [its] misery."  He denied torturing the cat or trying to be cruel to it:  "No, I wasn't torturing any animal at all.  I simply was putting it out of its misery.  It was sick.  It was a stray cat on my property, wild.  It was sick.  I didn't torture it.  I killed it[.]"

On cross-examination, Appellant admitted that he had no veterinary or medical training.  But he said that the cat had been at his house "until three of [his] cats died."  Then it went to another house where there were eight cats.  He said that "[w]atching it, it ha[d] some sick[ness] and disease.  [He] took the trash out and figured [he'd] go ahead and put it out of its misery, save some cats on [his] property from dying."  When asked about any signs that he saw of the cat's illness, Appellant testified that the cat's "nose was a little runny" and its "eyes were kind of matted.  Those are the only sick signs that were showing."  Appellant denied telling law enforcement anything about the cat being "under any kind of influence" or having "had something in its brain."  Appellant admitted that he knew that sick animals could be taken to a veterinarian for treatment but stated that he did not call a vet because this animal was "a wild cat" and "a

5

stray."

Section 42.092(b) of the penal code provides that "[a] person commits an offense if the person intentionally, knowingly, or recklessly . . . tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal."[9] "Cruel manner" is defined as "a manner that causes or permits unjustified or unwarranted pain or suffering."[10] "Torture" is defined to "include[] any act that causes unjustifiable pain or suffering."[11]

Appellant specifically argues that the State did not prove by a preponderance of the evidence that he tortured the cat "or killed or caused it serious bodily injury in a cruel manner." Appellant contends that the small amount of blood found on the cat and at the scene are the only parts of the admitted exhibit that could support a finding of torture or cruelty. He also focuses on the absence of an eyewitness and the absence of testimony by a veterinarian or qualified animal technician, but Smith heard the banging, and Appellant himself testified that he hit the cat in the head with a board three times until it stopped moving. Under the facts of this case, the evidence was sufficient for the trial court to conclude by a preponderance of the evidence that Appellant had caused unwarranted or unjustifiable pain to the cat and thus committed the

[9]Tex. Penal Code Ann. § 42.092(b)(1).

[10]*Id.* § 42.092(a)(3).

[11]*Id.* § 42.092(a)(8).

6

offense as charged in the motion to revoke.[12]

We therefore hold that the trial court did not abuse its discretion by granting the State's motion to revoke Appellant's community supervision, overrule Appellant's sole issue, and affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GABRIEL, and SUDDERTH, JJ.

GABRIEL, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 25, 2016

---

[12]*See Julian v. State*, No. 05-13-00913-CR, 2014 WL 3587387, at *2 (Tex. App.—Dallas July 21, 2014, no pet.) (mem. op., not designated for publication) (holding evidence that Julian "threw a healthy, three-month-old kitten from a second floor balcony[; that t]he kitten hit a drain pipe on a shed in the parking lot and bounced off onto the sidewalk[; that] . . . the kitten screamed and whined, shook and convulsed, and struggled for breath before dying[; and that she] looked like she had been 'broke up' . . . was sufficient" to show "'unjustifiable pain or suffering.' Contrary to [Julian's] argument otherwise, the jury did not need medical evidence to rationally reach this conclusion.").