# SUPREME COURT OF THE UNITED STATES

### DISTRICT OF COLUMBIA *v.* R.W.

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT OF
COLUMBIA COURT OF APPEALS

No. 25–248. Decided April 20, 2026

PER CURIAM.

In the wee hours of a winter morning in Washington, D. C., District of Columbia Metropolitan Police Officer Clifford Vanterpool received a radio dispatch call directing him to check out a suspicious vehicle at a specific address. Officer Vanterpool reached the apartment building at that address around 2:00 a.m. As he turned his marked police vehicle into the parking lot, he saw two people immediately flee from a car, "unprovoked," after "[p]olice had not done anything other than simply pull up." App. to Pet. for Cert. 48a. The runners left open at least one of the car doors. The driver then began to back out of the parking space, rear door still open. Officer Vanterpool decided to investigate. He parked directly behind the car, left his own vehicle, ordered the driver, R. W., to put his hands up, and drew his service weapon.

R. W. raised a "single argument" on appeal—that Officer Vanterpool lacked reasonable articulable suspicion sufficient to justify the seizure. *In re R.W.*, 334 A. 3d 593, 599 (D. C. 2025). The District of Columbia Court of Appeals held that Officer Vanterpool, by stopping R. W. without reasonable suspicion, violated the Fourth Amendment. We disagree.

When an officer makes a "brief investigatory stop[] of persons or vehicles that fall[s] short of [a] traditional arrest," the Fourth Amendment "is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'" *United States* v. *Arvizu*, 534 U. S. 266, 273 (2002) (quoting *United States* v. *Sokolow*, 490 U. S.

1, 7 (1989)). In assessing whether an officer had reasonable suspicion, a reviewing court must "look at the 'totality of the circumstances' of each case"—an analysis that precludes the "evaluation and rejection" of "factors in isolation from each other." *Arvizu*, 534 U. S., at 273–274. Because the D. C. Court of Appeals departed from these principles—and because Officer Vanterpool clearly had reasonable suspicion to stop R. W.—we reverse.

## I

Largely based on evidence found after Officer Vanterpool told R. W. to put his hands up, the District of Columbia charged R. W. (a minor at the time) with unauthorized use of a motor vehicle, felony receipt of stolen property, unlawful entry of a motor vehicle, and operating a vehicle in the District of Columbia without a permit. Before trial, R. W. moved to suppress the evidence obtained after he was stopped. Following a suppression hearing, the trial court denied R. W.'s motion, relying on four facts to conclude that the officer had reasonable suspicion to stop R. W.: (1) the officer had received a radio dispatch call regarding a suspicious vehicle at a specified address, (2) the officer saw "'two persons fleeing from a vehicle'" upon his arrival, (3) "'[i]t was almost 2 a.m.,'" and (4) as the officer approached the car, it began "'backing out of the parking space . . . while the rear driver's side door [was] still open.'" 334 A. 3d, at 599. After a bench trial, the trial court adjudicated R. W. delinquent on all counts and assigned R. W. to one year of probation with conditions.

On appeal, the D. C. Court of Appeals reversed the denial of the motion to suppress and vacated the delinquency adjudication.* The court "first assess[ed] the legitimacy and

---

*The District of Columbia conceded that "Officer Vanterpool seized R. W. when he first asked R. W. to put his hands up," so the D. C. Court of Appeals decided only "whether the facts then known by Officer

weight of each of the factors bearing on reasonable suspicion" before "weigh[ing] that information all together." *Id.*, at 600 (internal quotation marks omitted). In the first step of this analysis, it held that the trial court had erred by considering two factors: the radio dispatch call and the flight of R. W.'s companions. It "excis[ed]" those factors from the analysis. *Id.*, at 597. It then concluded that, without more, the remaining facts—the late hour and the car's movement—did not give rise to reasonable suspicion. After the D. C. Court of Appeals ruled, the District of Columbia sought certiorari.

## II

The question is whether the facts available to Officer Vanterpool—before he ordered R. W. to put his hands up— warranted the stop. In other words, we ask whether Officer Vanterpool had a reasonable suspicion that R. W. was engaged in criminal wrongdoing. *Sokolow*, 490 U. S., at 7–8. Such reasonable suspicion arises when, based on the "'totality of the circumstances,'" the detaining officer had a "'particularized and objective basis'" for suspecting criminal wrongdoing. *Arvizu*, 534 U. S., at 273 (quoting *United States* v. *Cortez*, 449 U. S. 411, 417 (1981)). Reasonable suspicion "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Kansas* v. *Glover*, 589 U. S. 376, 380 (2020) (quoting *Prado Navarette* v. *California*, 572 U. S. 393, 402 (2014)). It permits officers to make "'commonsense judgments and inferences about human behavior.'" *Glover*, 589 U. S., at 380–381 (quoting *Illinois* v. *Wardlow*, 528 U. S. 119, 125 (2000)).

On the facts of this case, Officer Vanterpool clearly had reasonable suspicion to stop R. W. Already on alert from

_____

Vanterpool created an objectively reasonable suspicion that criminal activity was afoot." 334 A. 3d, at 599 (citing *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968)).

the late-night dispatch call about a suspicious vehicle, the officer observed every person in R. W.'s car respond strangely to an approaching police car. Two people took off running. We have observed that "unprovoked flight upon noticing the police . . . . is certainly suggestive" of wrongdoing. *Id.*, at 124. The driver, R. W., did not run from the car, but his companions' flight cast his presence in a suspicious light. After all, we have observed that "'a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.'" *Maryland* v. *Pringle*, 540 U. S. 366, 373 (2003) (quoting *Wyoming* v. *Houghton*, 526 U. S. 295, 304–305 (1999)).

We need not determine whether that connection alone supported reasonable suspicion because R. W. was in the driver's seat and—after the passengers fled from the car—began backing out of the parking space, ignoring the car's open back door. For most drivers, it would be a surprising event for their back-seat passengers to exit the car and run headlong away from them. But we doubt that most would respond by putting their car into reverse and attempting to drive away without at least checking whether the doors were closed. R. W.'s own actions—combined with the panicked flight of his companions—strongly suggested that he was (like them) engaged in unlawful conduct he wished to hide from police. See *Sibron* v. *New York*, 392 U. S. 40, 66 (1968) (recognizing that "deliberately furtive actions and flight at the approach of . . . law officers are strong indicia of *mens rea*").

## III

The D. C. Court of Appeals reached a different conclusion by "excis[ing]" the radio dispatch and the conduct of R. W.'s companions from the analysis, and considering only "the lateness of the hour and the slight movement of the car." 334 A. 3d, at 597. The totality-of-the-circumstances test,

however, "precludes this sort of divide-and-conquer analysis." *Arvizu*, 534 U. S., at 274. As our precedents have recognized, "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *District of Columbia* v. *Wesby*, 583 U. S. 48, 60–61 (2018).

Indeed, this case reveals the perils of reviewing facts piecemeal and without context. Take the passengers' flight from the car. We have little doubt that, in some circumstances, an officer could not reasonably attribute his suspicion of a fleeing individual to bystanders milling nearby. Cf. *Ybarra* v. *Illinois*, 444 U. S. 85, 91 (1979) (recognizing that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"). But the "whole picture" here tells a different story. *Cortez*, 449 U. S., at 417.

After watching two people flee from a suspicious car, a reasonable officer surely would question the driver's next move. Why would the driver hurriedly back up the car without even closing a car door left open by his fleeing companions? Perhaps one could imagine an innocent explanation for such unusual behavior—the court below, for example, surmised that R. W. "may not even have noticed that his companions left the door open." 334 A. 3d, at 605. "But we have consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, 572 U. S., at 403 (quoting *Arvizu*, 534 U. S., at 277). Based on everything the officer observed on the night in question, he drew the "commonsense inference" that all three people in the car—including the driver—were trying to hide wrongdoing from the police. *Glover*, 589 U. S., at 381.

"[T]he Fourth Amendment requires . . . that a court 'slosh [its] way through' a 'factbound morass.'" *Barnes* v. *Felix*, 605 U. S. 73, 80 (2025) (quoting *Scott* v. *Harris*, 550 U. S. 372, 383 (2007)). There may be no "'easy-to-apply legal

test'" or "'on/off switch'" in this context, *Barnes*, 605 U. S., at 80 (quoting *Scott*, 550 U. S., at 382–383), but one thing is clear: "The 'totality of the circumstances' requires courts to consider 'the whole picture,'" *Wesby*, 583 U. S., at 60 (quoting *Cortez*, 449 U. S., at 417). The D. C. Court of Appeals expressly declined to do that. 334 A. 3d, at 599. It instead considered *only* the observations that "(1) it was 2:00 a.m. and (2) R. W. reversed a few feet in a parking spot while the vehicle's rear door was open." *Id.*, at 605. Expressly "excis[ed]" from its analysis was, for example, the compelling fact that two individuals fled the vehicle as soon as they spotted the police car. Pretending that the most revealing aspect of the encounter did not happen is incompatible with the totality-of-the-circumstances approach required by our precedents.

\*     \*     \*

The petition for certiorari and R. W.'s motion to proceed *in forma pauperis* are granted, the judgment of the District of Columbia Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SOTOMAYOR would deny the petition for a writ of certiorari.

# SUPREME COURT OF THE UNITED STATES

## DISTRICT OF COLUMBIA *v.* R.W.

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT OF
COLUMBIA COURT OF APPEALS

No. 25–248.   Decided April 20, 2026

JUSTICE JACKSON, dissenting.

The Fourth Amendment may require courts to "slosh . . . through a factbound morass." *Ante,* at 5 (internal quotation marks omitted).  It does not require readers of judicial opinions to do the same.  Any readable analysis will, of necessity, tick through factors, finding some weighty, others less so, and still others not at all, before piling them on a scale and assessing the result.  That is what the court below did here, and it was right to do so.  Announcing a conclusion without providing reasoning along the way is not helpful to the parties, the public, or the development of the law.

To its credit, the Court applies a similar, factor-by-factor approach here.  That the Court's analysis is comprehensible shows as much.  Like the court below, the *per curiam* takes account of the facts in turn: a "late-night dispatch call about a suspicious vehicle"; R. W.'s companions' "unprovoked flight"; R. W.'s shift into reverse with a car door still ajar. *Ante,* at 4 (internal quotation marks omitted).  And like the court below, the *per curiam* explains how much weight it assigns to each.  Unprovoked flight, the Court says, is "certainly suggestive" of wrongdoing.  *Ibid.* (internal quotation marks omitted).  "[C]ombined" with the flight, the Court continues, R. W.'s abrupt reversal "strongly suggested" wrongdoing.  *Ibid.*  This is how courts write opinions.

So I am not sure why our Court sees fit to intervene in this case, let alone to do so summarily.  If the intervention reflects a worry that the District of Columbia Court of Appeals (DCCA) misunderstands the Fourth Amendment's totality-of-the-circumstances analysis, that worry seems

unfounded. The DCCA has grasped the correct inquiry. Its precedents rightly observe that "[t]he issue is not whether any one factor individually justifies a stop, but rather whether 'collectively' the totality of the circumstances supports a determination that the officers had reasonable suspicion for an investigatory stop." *Parker* v. *United States*, 333 A. 3d 1162, 1175 (2025) (citing *Mayo* v. *United States*, 315 A. 3d 606, 637 (2024) (en banc)); see also, *e.g.*, *Maye* v. *United States*, 260 A. 3d 638, 647 (2021); *Golden* v. *United States*, 248 A. 3d 925, 941 (2021).

If today's decision instead reflects dissatisfaction with the DCCA's comment that it "'excis[ed]'" certain factors from its analysis, *ante,* at 4–5, I do not contest that this was poor word choice, see *United States* v. *Arvizu*, 534 U. S. 266, 274 (2002) (rejecting a "divide-and-conquer analysis"). But I do not think that word choice reflects a methodological error. Courts excise facts from their analyses every day. Opinion-writing is an exercise in culling the irrelevant; in application, no "totality-of-the-circumstances" test really lives up to its name. Indeed, today's *per curiam* necessarily omits a number of facts the Court finds insignificant—*e.g.*, the make and model of the car, the precise location of the stop, the color of R. W.'s friends' clothing. Though it does not say so, the Court "excises" those facts, too. It does not thereby misapply the Fourth Amendment.

If, finally, the Court's decision to intervene reflects disapproval of the DCCA's assessment of which particular facts to weigh and to what extent, I cannot fathom why that kind of factbound determination warranted correction by this Court. The DCCA assigned no weight to two facts—the dispatch call and the unprovoked flight. The Court does not seem to take issue with the first. For good reason: The DCCA reasonably applied our decisions explaining that an officer may not obtain reasonable suspicion by relying on the unsupported hunch of a fellow officer. See *Whiteley* v. *Warden, Wyo. State Penitentiary*, 401 U. S. 560, 568 (1971);

JACKSON, J., dissenting

*United States* v. *Hensley*, 469 U. S. 221, 232 (1985). The Court may be right that the second—the unprovoked flight—should have borne some rather than no weight. But if this context-specific adjustment is all the *per curiam* seeks to achieve, it does not merit the use of our summary discretion.

Even if I would have assigned more heft to a particular fact in my own first-instance assessment, I would not word-smith a lower court in this fashion. In my view, this is not a worthy accomplishment for the unusual step of summary reversal. Therefore, I respectfully dissent.